**DEPARTMENT OF NATURAL RESOURCES and Wabash Valley Archaeological Society, Inc. and Council For the Conservation of Indiana Archaeology, Inc., Appellants,**

v.

**INDIANA COAL COUNCIL, INC. and Huntingburg Machinery & Equipment Rental, Inc., Appellees.**

No. 19S00-8802-CV-263.

Supreme Court of Indiana.

Aug. 31, 1989.

Tom C. Huston, David F. Hamilton, Arend J. Abel, Barnes & Thornburg, Indianapolis, for Wabash Valley and Council for The Conservation of Ind. Archaeology, Inc.

Linley E. Pearson, Atty. Gen., Steven J. Szostek, Deputy Atty. Gen., Myra P. Spicker, Indianapolis, for Dept. of Natural Resources.

Mark W. Rietman, Buthod Longest Clark Rietman & Steedman, Evansville, for Huntingburg Machinery & Equipment.

G. Daniel Kelley, Jr., Stephen M. Terrell, Ice Miller Donadio & Ryan, J. Nathan Noland, Indianapolis, for Indiana Coal Council, Inc.

DeBRULER, Justice.

This is an appeal from the Dubois Circuit Court and the determination there that certain provisions of Indiana's version of the Surface Mining Control and Reclamation Act ("SMCRA"), I.C. 13–4.1–1–1, et seq., and regulations promulgated thereunder, 310 I.A.C. 12–2–1, et seq., as applied by the Indiana Department of Natural Resources to land owned by Huntingburg Machinery & Equipment Rental, Inc. ("HUMER") amounted to an unconstitutional taking under the Fifth Amendment to the Constitution of the United States. Under Appellate Rule 4(A)(8), this Court has exclusive jurisdiction to hear cases in which a statute has been declared unconstitutional, and because of the important constitutional issues involved, transfer is granted.

The land at issue, owned by HUMER, is currently being farmed but sits atop three seams containing approximately 1.537 million tons of mineable coal. In a small, 6.57 acre portion of the land, sitting on top of approximately 55,200 tons of coal, lies what has become known as the Beehunter Site, an archaeologically significant area, rich in cultural deposits with substantial historic and scientific value. The Beehunter Site's importance stems from the fact that below the plow zone it contains a substantially intact "midden," with artifacts from four distinct cultural periods of occupation, which would allow anthropologists to make cross-cultural comparisons of different adaptations to the same environmental

niche. The site was nominated and found eligible for listing on the National Register of Historic Places. 51 Fed.Reg. 6677 (1986).

The Wabash Valley Archaeological Society, Inc. ("Wabash Valley") petitioned the Department of Natural Resources ("DNR") to have the site designated as an area unsuitable for surface coal mining under I.C. 13–4.1–14–2. The director of DNR may declare an area unsuitable for surface coal mining if the coal mining operation will "affect fragile and historic lands in which the operation could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems." I.C. 13–4.1–14–4. A public hearing was held and on November 19, 1985, pursuant to this provision and Wabash Valley's petition, the director made an initial determination that Beehunter was an area unsuitable for surface coal mining. By this time the Indiana Coal Council ("Coal Council") and the Council for the Conservation of Indiana Archaeology ("CCIA") had entered the proceedings. The Coal Council and HUMER filed timely objections and a hearing was held on December 19, 1985, pursuant to I.C. 4–22–1–12 (repealed 1986). A final order was issued by the director of the DNR on January 3, 1986 designating the Beehunter Site unsuitable for surface coal mining.

As part of his final order, the director included a mitigation plan which provided a means by which the designation of "area unsuitable" could be removed. It calls for a program of site testing and data recovery conducted by an archaeological contractor approved by DNR. The plan does not require HUMER to carry out the plan, to expend any money, or to convey any property or property right to the State. It affects no existing contractual rights. In fact, the designation does not prevent HUMER from continuing to farm the land, nor from mining virtually all of the coal under its farmland, so long as the coal that lies underneath the 6.57 acre Beehunter Site is extracted by means other than strip mining, a process which would destroy the archaeological information contained in the site. For these reasons, and those delineated below, we hold that the director's order, designating the Beehunter Site as an area unsuitable for surface coal mining and providing a mitigation plan by which the designation may be removed, does not amount to an unconstitutional taking of property.

The Fifth Amendment provides that "[no] private property [shall] be taken for public use, without just compensation," and, of course, applies to the states through the Fourteenth Amendment. This seemingly simple mandate has become increasingly difficult to apply as the complexities of modern life have necessitated a wide variety of land use regulations. More than sixty years ago, Justice Holmes recognized that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922), but also noted that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking," *id.*, 260 U.S. at 415, 43 S.Ct. at 160, 67 L.Ed. at 326. The difficulty has been in devising rules that establish a line between regulation that is permissible and that which "goes too far." Consequently, the determination often rests on "ad hoc factual inquiries" involving the facts and circumstances of each particular case. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 508, 107 S.Ct. 1232, 1254, 94 L.Ed.2d 472, 503 (1987) (Rehnquist, C.J., dissenting), citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978).

■ However, we are not without guidance in this area. Recent United States Supreme Court cases have provided a two-prong test as an aid in making the determination. Under this rule, when applied to a particular piece of property, a land use regulation will not effect a taking if it substantially advances a legitimate state interest and does not deprive an owner of economically viable use of his property. *Nollan v. California Coastal Comm'n*,

483 U.S. 825, 834, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677, 687 (1987). Until recently, the inquiry generally focused on the second of the two prongs, attempting to determine the economic impact of the regulation on the land. *See Keystone*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472; *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. In *Nollan*, however, the Court emphasized the first prong in striking down a condition placed upon the granting of a zoning variance, finding that the condition did not substantially advance the interests sought to be achieved by the regulation. The two prongs are indicative of the various guises that a constitutional attack on a land use regulation may take.

The essence of the first prong of the test is whether government had the right to exercise its police power in the manner it did, regardless of the burden to the property. Or, in other words, it asks the question: has government regulated where it should not have done so? If the regulation does not bear a substantial relation to the legitimate ends sought to be achieved, either through a failure of the statute as a whole to serve those ends or as applied to a particular piece of property, then the exercise of the police power is deemed to be unreasonable. A variation of this type of challenge would exist where the ends themselves were not legitimate. The state could not, for example, regulate property simply because it does not agree with the religious or political views of the land owner. *See Williamson Co. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 202 n. 1, 105 S.Ct. 3108, 3125 n. 1, 87 L.Ed.2d 126, 149 n. 1 (1985) (Stevens, J., concurring).

The economic inquiry of the second prong of the test has its roots in Justice Holmes's decision in *Pennsylvania Coal*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, which is generally regarded as the seed from which all modern regulatory taking cases have grown. In that case, a Pennsylvania statute requiring that a certain amount of coal be left unmined so as to prevent subsidence to the surface estate was struck down as unconstitutional be-cause it interfered with the distinct investment-backed expectations of the owners of the mineral estate and did not provide compensation for the coal that was "taken." This consideration for distinct investment-backed expectations remains essential to-day. *See Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, 343 (1979); *Penn Central*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648. It is also necessary to examine the economic impact of the regulation on the claimant in terms of the diminution in value of the land, *id.*, and the extent of any interference with the present use of the land, *Penn Central*, 438 U.S. at 136, 98 S.Ct. at 2665, 57 L.Ed.2d at 656. In determining the degree of diminution in value, the particular segment that is affected is not considered alone, but the claimant's property as a whole is compared to that portion which is encumbered. *Keystone*, 480 U.S. at 497, 107 S.Ct. at 1248, 94 L.Ed.2d at 496. Of course, the nature and character of the interference is also relevant, and where a regulation results in permanent physical occupation of property, a taking will almost invariably be found. *Id.*, 480 U.S. at 488–489 n. 18, 107 S.Ct. at 1244 n. 18, 94 L.Ed.2d at 490 n. 18; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

All of the economic inquiries deal with the degree to which a property has been encumbered by a regulation. In that sense, the essence of the second prong of the test is whether government has regulated to a greater extent than it should have so that a land owner has been effectively deprived of productive use of his property.

We turn now to the claims of HUMER and the Coal Council that the director's order here declaring the Beehunter Site as an area unsuitable for surface mining of coal is an unconstitutional taking. We note at the outset that HUMER and the Coal Council have challenged the director's order as invalid under the Fifth Amendment and that the burden on a party attempting to show that a regulatory taking has occurred is a heavy one. *See Keystone*, 480

U.S. at 499, 107 S.Ct. at 1246, 94 L.Ed.2d at 497. Turning to the second prong of the analysis, it is clear that the economic impact on HUMER here is comparatively slight and no showing to the contrary was made in any of the proceedings below. The record indicates that HUMER or its predecessors have held the land upon which the Beehunter Site is located since the mid-1940s. It has been farmed since that time and there is no indication that it was acquired with the intent to mine coal. In fact, the seams of coal were apparently discovered rather recently. It cannot be said, therefore, that the designation of Beehunter has interfered with HUMER's distinct and reasonable investment-backed expectations since there was no expectation of coal mining at the time investment in the property was made. Furthermore, the designation obviously does not interfere with HUMER's present use of the property. It has been farming the land and presumably will continue to do so.

More importantly, the overall effect on the value of the land is minute here. The Beehunter Site represents approximately 6.57 acres of a 305 acre farm, or just slightly over two percent of the whole. In terms of mineable coal, the designation affects only 6.5 percent of the total coal resources on the land and, if alternative methods of mining were used, such as auguring, that figure could be reduced to less than three percent. This Court has previously upheld much more "intrusive" restrictions upon land in the context of zoning. In *Young v. City of Franklin* (1986), Ind., 494 N.E.2d 316, it was noted that a land owner is not entitled to the highest and best use of his land and a taking results under the economic impact inquiry only when all reasonable use of the land is prevented by the land use regulation. *Id.* at 318, citing *City of Anderson v. Associated Furniture & Appliances, Inc.* (1981), Ind., 423 N.E.2d 293; *Foreman v. State ex rel. Department of Natural Resources* (1979), 180 Ind.App. 94, 387 N.E.2d 455. This position is in harmony with decisions of other courts that have sustained land use regulations despite their having the effect of severely reducing or holding down

the land value from that of its desired use. *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631; *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Pompa Construction Corp. v. Saratoga Springs*, 706 F.2d 418 (2d Cir.1983); *Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980), *cert. denied sub nom. Mark–Garner Associates, Inc. v. Bensalem Township*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *William C. Haas & Co. v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980).

Thus, because HUMER's investment-backed expectations and present use of the land have not been interfered with and because there has been no significant diminution of the land's value, it is clear that from an economic standpoint, the extent of government's intrusion into HUMER's property is comparatively small and, in and of itself, does not rise to the level of a taking of property. However, HUMER and the Coal Council rely, for the most part, on the first prong of the takings inquiry in their attack on the constitutionality of the designation, arguing the director's order and accompanying mitigation plan do not substantially advance legitimate state interests. In so doing, they challenge the constitutionality of the statute and regulation not as a whole, but as applied to HUMER's property.

There is no set rule to apply in making the determination of what constitutes a legitimate state interest but it is generally accepted that government has the power to enact laws and regulations to promote order, safety, health, morals and the general welfare of society. The decisions of this Court and the Courts of Appeals have not dwelled on this aspect of the takings inquiry. However those decisions implicitly make clear that a broad range of government interests satisfy the legitimacy requirement. *Young*, 494 N.E.2d 316 (upholding refusal to rezone land to residential class); *Alanel Corp. v. Indianapolis Redevelopment Comm'n* (1958), 239 Ind. 35, 154 N.E.2d 515 (upholding redevelop-

ment acts dealing with acquisition of blighted urban areas), *Foreman,* 180 Ind. App. 94, 387 N.E.2d 455 (upholding flood control act). Federal decisions have reached similar conclusions. *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (scenic zoning); *Penn Central,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (landmark preservation); *Barrick Realty, Inc. v. City of Gary,* 491 F.2d 161 (7th Cir.1974) (maintaining stable integrated neighborhoods).

Protecting our national and state heritage through the preservation of archaeological sites must be included in this broad spectrum of legitimate interests of government. The information in these sites expands our knowledge of human history and prehistory and thus enriches us as a state, nation and as human beings. The general welfare of the public is greatly enhanced by such knowledge. We note that our Court of Appeals implicitly recognized this in *State Highway Comm'n v. Ziliak* (1981), Ind.App., 428 N.E.2d 275, declaring that highway construction projects must adhere to the Indiana Environmental Policy Act which requires that all practicable means be used to coordinate resources to "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* at 281; I.C. 13–1–10–2. We recognize it explicitly here.

In examining the nexus between the land use regulation and the state interest, we have relied on the phrasing of earlier Supreme Court cases, and have required that there be a "substantial relationship" between the two. *Young,* 494 N.E.2d at 318; *see Nectow v. City of Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928); *Ambler Realty,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303. However, there is authority that suggests that a land use regulation need only be "reasonably related" to the legitimate state interests to be valid, *Penn Central,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631, 652; *Foreman,* 387 N.E.2d 455, 461, or that it be "reasonably necessary to the effectuation of a substantial public purpose," *Penn Central,* 438 U.S. at 127, 98 S.Ct. at 2660, 57 L.Ed.2d at 650, or that it "substantially

advance" a legitimate state interest, *Agins,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112. The Supreme Court has, as yet, been unable to settle on an exact standard for assessing the connection between the regulation and the state interest, *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147, 97 L.Ed.2d at 687–688, and we see no reason to depart from the standard as stated in *Young* that there be a "substantial relation" between the two. The basis for the inquiry is to assure that the state does not effect a collateral purpose or end under the guise of a legitimate purpose or end, regulating where it has no right to do so. Such assurance is obtained when the effect of the regulation is substantially consistent with the legitimate ends of the state.

Here the legitimate ends of protecting cultural resources from the threat of strip mining are served by both the designation of the Beehunter Site as an area unsuitable for surface mining of coal and by the mitigation plan which allows a means for removal of the designation once the information in the site is scientifically recovered. The order is completely consistent with legitimate state ends.

Be that as it may, HUMER and the Coal Council direct this Court's attention to *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677, and argue that case has imposed an entirely new analytical framework on takings inquiries where the state places a condition on the removal of a land use restriction. They maintain that, in such an instance, the condition must serve the same legitimate police power interest as the land use restriction to be valid and that where the condition requires a conveyance to the state or would otherwise amount to a taking, a heightened level of scrutiny should be employed in examining the state action.

The *Nollan* Court relied on the rule from *Agins* that the regulation "substantially advance" a legitimate state interest and did hold that a condition to removal of a land use restriction must similarly advance that end. *Id.,* 483 U.S. at 834, 107 S.Ct. at 3146, 97 L.Ed.2d at 687. However, it did not adopt any particular level of scrutiny to be

applied across the board to all takings inquiries:

> We are inclined to be particularly careful about the adjective ["substantial"] where the *actual conveyance of property* is made a condition of the lifting of a land use restriction, since in that context there is a heightened risk that the purpose is avoidance of the compensation requirement rather than the stated police power objective.

*Id.*, 483 U.S. at 841, 107 S.Ct. at 3150, 97 L.Ed.2d at 692 (emphasis added). If this amounts to a heightened scrutiny, it clearly extends only to situations where government requires an actual conveyance of property as a condition to removal of a land use restriction. Furthermore, the stated test used by this Court, that there be a "substantial relation" between the regulation or the condition and the legitimate state interest, is essentially the same standard.

In their reliance on *Nollan*, HUMER and the Coal Council attempt to cast the director's inclusion of a mitigation plan with his order as amounting to a condition requiring an intrusion tantamount to an actual conveyance of property. The order and mitigation plan require nothing of the sort. HUMER is required to do nothing and it is free to continue the present use of farming the land in question. The extent of the intrusion here does not rise to the level of that in *Ziliak* where the State made an outright demand for access to the owner's land to conduct an archaeological dig by state-employed archaeologists. *Ziliak*, 428 N.E.2d 275. Here, the State is not seeking to physically occupy the land nor requiring any conveyance, it is only attempting to preserve the information at Beehunter until any qualified archaeologist can recover it. As noted above, the intrusion here is minimal from an economic standpoint and amounts to mere regulation.

Furthermore, such conditions to the removal of land use restrictions are wholly within the perimeters of *Nollan:*

> [T]he Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condi-

tion construction upon some concession by the owner, *even a concession of property rights,* that serves the same end. If a prohibition designed to accomplish that purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not.

*Nollan,* 483 U.S. at 836, 107 S.Ct. at 3148, 97 L.Ed.2d at 689 (emphasis added). We have already noted that the purpose of the alternative to the prohibition here, the mitigation plan, is consistent with the legitimate government interest served by the prohibition itself: preservation of areas culturally significant to our heritage. Even if we accept the appellees' characterization of DNR's mitigation plan as conditioning the removal of the area unsuitable designation upon HUMER's "conveying" archaeological information to the State for public use without compensation, it is clear that under *Nollan* such a condition would be a constitutionally valid exercise of the police power, since the removal of a restriction may be conditioned even on "a concession of property rights." *Id.* It would be not only strange, but against all reason to conclude that the State's prohibition of surface mining of the Beehunter Site was a legitimate exercise of the police power but that providing HUMER with an alternative to the prohibition which, like the prohibition itself, also helped to preserve our cultural heritage was not a legitimate exercise of that power. *Id.*

■ HUMER and the Coal Council argue that the director's order and mitigation plan do not substantially advance the legitimate state interest of preservation of our cultural heritage because they protect Beehunter only against destruction from surface coal mining. They suggest that because the site could be destroyed by any number of other means that have not been protected against by the State, including malicious destruction by the owner, the government's legitimate interest is not substantially advanced by the designation alone. However, we do not read the cases delineating takings jurisprudence to re-

quire that a regulation be successful in accomplishing substantially all possible ends that further the legitimate state interest, only that it substantially achieve those ends the legislature, in furtherance of legitimate state interests, deems necessary to address. The nature of the political process dictates that "[l]egislatures may implement their program step by step ... in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976).

■ Here the state interest sought to be protected is our cultural heritage by prohibiting the destruction of cultural data from strip mining. That the legislature has not, as yet, chosen to address other threats to these archaeologically significant areas does not automatically transpose their action into a taking or an unconstitutional exercise of the State's police power. The regulations as applied to HUMER's property through the director's order and mitigation plan bear a substantial relation to the legitimate state interest of preserving our cultural heritage by protecting culturally significant data from strip mining. They are, thus, a legitimate exercise of the State's police power and since the economic impact of the regulations is slight, they do not amount to an unconstitutional taking of HUMER's property.

Finally, HUMER and the Coal Council argue that the director's order was arbitrary and capricious and an abuse of discretion. The rule as to administrative actions has been well stated by our Court of Appeals, and we adopt it here, that an administrative act is arbitrary and capricious only where it is willful and unreasonable, without consideration and in disregard of the facts or circumstances in the case, or without some basis which would lead a reasonable and honest person to the same conclusion. *Metropolitan School District* (1983), Ind.App., 451 N.E.2d 349. Moreover our decisions have stated that courts may not substitute their own judgment or opinion for that of the adminstrative body acting in discretionary matters within its jurisdiction. *Mann v. City of Terre Haute* (1960), 240 Ind. 245, 163 N.E.2d 577. HUMER and the Coal Council maintain that the director should have accepted a mitigation plan proposed by HUMER in place of the plan that was made a part of the order; and, by not doing so, the intent of the statute was not carried out because HUMER is forced to bear the cost of an archaeological dig and is given an incentive to destroy the site by other means. These issues have been addressed above. They look no better cloaked in a challenge based on arbitrariness, capriciousness or abuse of discretion than they do in a constitutional guise. The mitigation plan proposed by the director requires nothing of HUMER except to refrain from strip mining coal in a small portion of its property until important cultural information can be recovered. HUMER introduced no evidence at any of the administrative hearings that its plan was superior to that proposed by the director, or even that it was minimally adequate to accomplish that end. As to any incentive HUMER may have to maliciously destroy Beehunter, it is entirely plausible for the director to have concluded that the low regard in which any such action would be held by the DNR at subsequent hearings for removal of the "area unsuitable" designation was a sufficient deterrent to such unethical behavior.

In short, the director's order is entirely reasonable and there is a sufficient basis in the record which would lead a reasonable and honest man to the same conclusion. The director fulfilled his statutory obligation to prepare a detailed statement on the potential coal resources of the area, the demand for coal, and the impact of the designation on the economy, the environment and the coal supply. I.C. 13–4.1–14–3. The record shows that Wabash Valley and CCIA introduced expert witnesses whose testimony tended to support the director's decision and HUMER and the Coal Council produced no experts whatsoever. The order is neither arbitrary, capricious nor an abuse of discretion.

The request for oral argument is denied. The decision of the Dubois Circuit Court setting aside the order of the director of the Department of Natural Resources is vacated and the cause is remanded to that court to enter a decree denying relief from that order.

SHEPARD, C.J., and GIVAN, PIVARNIK and DICKSON, JJ., concur.