The NATURAL RESOURCES COMMIS-
SION of the STATE OF INDIANA, The
Indiana Department of Natural Re-
sources, and Jack L. Jarrett, Appellants,

v.

AMAX COAL COMPANY and AMAX
Coal Industries, Inc., Appellees.

INDIANA DEPARTMENT OF NATURAL
RESOURCES, Natural Resources Com-
mission, Bureau of Mine Reclamation,
Division of Reclamation, Patrick R. Ral-
ston, as Director of The Indiana Depart-
ment of Natural Resources, Mike Long,
as Deputy Director of The Bureau of
Mine Reclamation, and Mike Sponsler,
as Director of the Division of Reclama-
tion, Appellants,

v.

STATE ex rel. B & LS CONTRACTING,
INC., and Shand Mining, Inc.,
Appellees.

Nos. 49S04–9408–CV–684,
49S04–9408–CV–684.

Supreme Court of Indiana.

Aug. 3, 1994.

Rehearing Denied Nov. 1, 1994.

Linley E. Pearson, Atty. Gen., Myra P. Spicker, Deputy Atty. Gen., Div. of Reclamation, Indianapolis, for state.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, David H. Pope, Carr, Tabb & Pope, Atlanta, for appellant Jack L. Jarrett.

G. Daniel Kelly, Jr., W.C. Blanton, Deward P. Steegmann, Ice Miller Donadio & Ryan, Indianapolis, for appellees.

## ON PETITION TO TRANSFER

DeBRULER, Justice.

AMAX Coal Company and AMAX Industries, Inc. (AMAX) petitioned for court review of the administrative actions of the Natural Resources Commission (NRC), the enforcement arm of the Indiana Department of Natural Resources (DNR). The Marion Superior Court held for AMAX and remanded the case to the NRC for proceedings consistent with the trial court's instructions. In a case involving a similar issue, B & LS Contracting, Inc. and Shand Mining, Inc. (B & LS) filed a complaint against the DNR and its Director, Patrick R. Ralston, and petitioned for relief from certain agency actions. B & LS filed the cause in the same court and before the same judge as AMAX.[1] The Marion Superior Court also held for B & LS, granting injunctive relief. Jarrett appealed the AMAX decision, and the NRC and the DNR appealed both trial court decisions. The Court of Appeals, Fourth District, granted AMAX's and B & LS's joint motion to consolidate the two cases for appeal, and affirmed in both cases. *Natural Resources Comm'n v. Amax Coal Co.* (1992), Ind.App., 603 N.E.2d 1349. The NRC/DNR and Jarrett petition for transfer to this Court. Transfer is granted, and the opinion of the Court of Appeals is vacated.

Congress acknowledged that coal mining operations contribute significantly to the energy requirements of the United States, and that surface coal mining is an appropriate method of obtaining the natural resource. Recognizing the negative environmental impacts and the public health and safety hazards associated with surface mining operations, Congress adopted the federal Surface Mining Control and Reclamation Act of 1977 (F–SMCRA), 30 U.S.C.A. §§ 1201–1328. The Indiana Surface Mining Control and Reclamation Act (I–SMCRA), Indiana's counterpart to F–SMCRA, similarly recognizes the need to protect society and the environment, as well as to assure the rights of surface land owners and others, by preventing and minimizing the adverse effects of surface mining operations. I.C. § 13–4.1–1–2 (West 1990). I–SMCRA is codified at I.C. § 13–4.1. Other states regulate water rights solely through the permit process of their surface coal mining reclamation acts. *See e.g. Russell v. Island Creek Coal Co.*, 182

---

1. The same attorneys represent appellees AMAX and B & LS.

W.Va. 506, 389 S.E.2d 194, 202–03, fn. 11 (1989). State plans have been approved in whole by the Secretary of the Interior.

Many seams, or layers, of coal are located throughout Indiana. The coal seams are identified by number, with seam one being the deepest. Layers of sedimentary rock, i.e., limestones, sandstones, shales, and siltstones, separate the layers. The surface layer consists of glacial till, which is loose rocks and soil deposited by the glaciers that wandered over Indiana during the past 100,000 years. Some of the deeper seams were reached by shaft mining starting around the turn of the century.

*APPELLEE AMAX*

The land in Sullivan County, Indiana, is rich with seams of coal. Underground coal mining commenced in Sullivan County around the turn of the century. Today, the area is honeycombed with abandoned underground mine tunnels at different depths below ground. Many of the abandoned mines are filled with ground water that has seeped or flowed into the cavities.

One AMAX surface coal mining operation in that county—the Minnehaha Mine, located in Cass Field—mines the seam closest to the surface there, coal seam number seven. Two abandoned shaft mines, the Regent Mine and Vandalia Number 17 Mine, lie within coal seam six, partially below the Minnehaha Mine. As with the other abandoned mines in the area, these mines are filled with ground water that percolated into the mined-out areas. The ground water in these mines is under hydrostatic pressure, and the pressure forces the water to flow up into the Minnehaha through cracks and fissures caused by the mining process.

In the Fall of 1988, AMAX applied to the NRC, the ultimate authority of the DNR,[2] to amend its surface coal mining permit (designated by the parties as the "Cass–2 permit"), in order to expand its mining area. Appellant Jack L. Jarrett (Jarrett), an owner of surface property adjacent to the property

AMAX was mining, opposed AMAX's Cass–2 permit application.

On May 17, 1989, a partial panel of the NRC approved AMAX's permit, pursuant to I–SMCRA. However, the panel attached thirteen conditions to the permit, requiring that AMAX comply with each. One condition, Condition 12, prohibited the use of requested "dewatering" wells until AMAX conducted additional surveys and provided additional information about the possible effects of the depressurizing wells. Both AMAX and Jarrett sought administrative review of the NRC panel decision, pursuant to I.C. § 4–21.5–3–7 and 310 IAC 0.6–1–3. On June 21, 1989, AMAX requested administrative review of the NRC permit approval, challenging the addition of Condition 12 to the permit. On June 23, 1989, Jarrett requested administrative review of the permit approval, arguing that the NRC had issued the permit without finding whether the dewatering would cause subsidence on Jarrett's land.

Following the procedure outlined in I.C. § 4–21.5–3–7(d), the DNR appointed an administrative law judge (ALJ) to conduct the review. The ALJ issued an order on July 27, 1990. The NRC considered the ALJ's report at its August 21, 1990 meeting, and held that I–SMCRA authorized the DNR to regulate the use of ground water by surface coal mining permittees so that such use does not result in damage to property located outside the surface coal mining permit area. Pursuant to I.C. § 4–21.5–3–29, the NRC issued its written final order on October 26, 1990. The NRC order included the following pertinent provisions:

IC 13–2–2–2 and IC 13–14.1–8–1(21) authorize the Department of Natural Resources to regulate the use of groundwater by a surface coal mining permittee so that such use does not result in damage to property located outside the surface coal mining permit area. IC 13–4.1–4–7 expressly provides for the attachment of conditions to the approval of a surface coal mining permit application.... [T]he Commission and the Commission's delegates ... have

---

**2.** The NRC is the ultimate authority of the DNR as provided by I.C. § 14–3–3–21 (West supp. 1993).

used the procedure of attaching substantive conditions to the approval of portions of an application as a means of deferring action on other portions of the application. That being the case, it was lawful and proper for the Commission's delegates to defer certain decision with respect to portions of the Cass–2 Permit application by attaching Conditions 12 and 13 to their approval of other aspects of that application. . . .

The NRC order stated that the DNR possessed the statutory authority to regulate the use of ground water by a surface coal mine operator, and approved the manner in which Condition 12 was imposed to regulate that use. That condition states:

No additional wells to dewater Coal VI and Coal VII shall be activated until sufficient detail is added to the statement of probable hydrological consequences to determine the effects that the dewatering may have on potential subsidences both within the permit and adjacent off-site areas. In addition, a ground water monitoring well must be installed in Coal VI at a location approved by the Division of Reclamation and a monitoring plan approved and initiated before any additional dewatering wells are activated.

As prescribed by I.C. § 4–21.5–5–2, both AMAX and Jarrett filed petitions for judicial review of the NRC action, AMAX on September 19, 1990, and Jarrett on September 25, 1990. On November 7, 1990, AMAX filed a motion for partial summary judgment on the water rights issue. Jarrett filed his motion for partial summary judgment of these issues on January 29, 1991.

On June 17, 1991, the trial court issued its Findings of Fact, Conclusions of Law, and Judgment. The text of the final judgment and order reads as follows:

The Court, having granted AMAX's Motion for Partial Summary Judgment On Water Rights Issues, denied Jarrett's Motion, and made its Findings of Fact and Conclusions of Law, now enters its final judgment thereon.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the imposition of Condition 12 to the Cass Permit Amendment (S–00041–2) was unlawful and in excess of [the NRC's] authority and jurisdiction.. This matter as to all issues related thereto is remanded to [the NRC] for further actions not inconsistent with this judgment.

## APPELLEE B & LS

On July 15, 1988, the NRC approved a permit for appellee B & LS to conduct surface coal mining operations at the Hornet Mine, located in Clay County, Indiana. As part of its mining operations, B & LS planned to pump surface and ground water from its mining pits.

During the application process, several owners of property adjacent to the mine site expressed their concern that B & LS's pumping of water would drain their lakes, and asked the NRC for an explanation of the applicable laws of the State. On August 19, 1988, following NRC approval of the permit but prior to the permit's issuance, these land owners sent a letter to the DNR requesting an administrative hearing to review the approval of the permit. In a brief replying to the land owners' request, the DNR claimed that it had no authority to regulate ground water use.[3] Because the DNR contended that it had no authority to regulate B & LS's use of ground water or water replacement, on August 10, 1989 the land owners filed a request to withdraw their challenge to the NRC permit approval.[4] The NRC issued the permit on August 2, 1989. B & LS then began to operate a surface mining operation pursuant to that permit.

3. The DNR argued:
   It is the DNR's position that [amendments to I.C. § 13–4.1–8–1(25)] indicate that the legislature intended ... [to] defer water rights determinations to the law as it existed before [I-SMCRA] was passed. This interpretation means that Indiana Common law as expressed in Wiggins v. Brazil Coal and Clay, 452 N.E.2d 958 (Ind.1983), still controls. Under the law of Wiggins, the DNR ... has no authority to require an operations plan that is designed to avoid the dewatering.

4. On October 10, 1989, the NRC issued a final order dismissing the landowners' request for review.

After issuing the B & LS permit, the NRC determined, in the above AMAX proceedings, that the DNR did have the authority to regulate a surface coal mine operator's use of ground water. Prior to judicial review of the AMAX proceedings, the DNR issued a Director's Order to B & LS requiring the company to show that its surface coal mining operations would not cause damage to adjacent landowners by temporarily or permanently lowering offsite water bodies. The order, issued on May 17, 1991, stated:

If temporary or permanent lowering of water bodies causes damage it will be contrary to DNR's interpretation of I–SMCRA. Therefore, B & LS must demonstrate one of the following:

1) Right of entry documentation for off-site lakes to be lowered through purchase, lease or easement which authorizes such lowering by the owner(s) of record of the water bodies.

2) B & LS operations will not cause damage as the result of the lowering of off-site water bodies as shown by appropriate hydrologic analysis of surface and groundwater mining operations and any other relevant factors as approved in a permit revision by the Department.

Absent a showing of either, the DNR would declare the B & LS mining permit not in compliance with I–SMCRA.

On June 3, 1991, B & LS filed its Verified Complaint and Petitions and Applications for Declaratory Judgment, Judicial Review, Injunction, Preliminary Injunction, Temporary Restraining Order, and Mandate and Prohibition in the Marion Superior Court. On June 4, 1991, B & LS filed a request for a hearing and oral argument on its motion for temporary restraining order and preliminary injunction. On June 5, 1991, B & LS filed its Petition for Administrative Review, Stay, and Temporary Relief with the NRC. On June 11, 1991, the NRC/DNR filed its Motion to Dismiss, because B & LS had not exhausted its administrative remedies, and noting that

administrative review was still pending.[5] On June 12, 1991, B & LS filed its response to the motion to dismiss, claiming that it was entitled to judicial review of a non-final agency action, due to the threat of immediate and irreparable harm. On June 14, 1991, the Marion Superior Court issued a Temporary Writ of Prohibition, Stay, and Restraining Order, which read:

**WHEREFORE IT IS HEREBY ORDERED ADJUDGED AND DECREED:**

That [the NRC/DNR] and any of their personnel are prohibited from enforcing the Director's May 17, 1991 Order or using it as a basis for any violation of SMCRA until further Order of this Court

On June 21, 1991, the parties stipulated to certain facts, including the consolidation of B & LS's applications for preliminary and permanent injunctions. The trial court also ordered that the temporary writ of prohibition, stay, and restraining order were to remain in force.

On August 21, 1991, the trial court entered its Findings of Fact, Conclusions of Law, and Judgment. The Judgment read as follows:

Based upon the Findings of Fact and Conclusion of Law set forth above, the Court now enters the following final judgment:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

(A) That [B & LS's] Petitions and Applications For Declaratory Judgment, Injunction, Judicial Review and Writ Of Prohibition are GRANTED;

(B) That this Court hereby declares as a matter of law that DNR and the Director had no authority to issue the Order of May 17, 1991; and

(C) That effective immediately [the NRC/DNR] and any of their personnel are permanently prohibited and enjoined from enforcing the Director's May 17, 1991 Order

---

**5.** In its complaint, B & LS contended that it had exhausted its administrative remedies by filing a petition for administrative review, petition for stay, and petition for temporary relief before the NRC. B & LS also argued that any administrative review would be futile, because the ALJ and NRC would follow the NRC's "erroneous" interpretation of its authority under I–SMCRA. B & LS also pleaded that it would suffer immediate and irreparable harm if the Director's Order remained in effect.

or using it as a basis for any violation of SMCRA.

Both the NRC/DNR and Jarrett appealed the trial court's decision in the AMAX case, and the NRC/DNR appealed the outcome of the B & LS case.

## IN COURT

■ The trial court's decisions involved the review of administrative orders pursuant to the specific provision of I.C. § 4–21.5–5–1 et seq. Upon judicial review of an agency order, a trial court is limited, by statute, to determining whether the agency action is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

I.C. § 4–21.5–5–14(d) (West 1990); *see also St. Bd. of Tax Comm'rs v. Jewell Grain Co.* (1990), Ind., 556 N.E.2d 920, 921 (when reviewing an administrative decision, a court is limited to determining whether the agency possessed jurisdiction of the subject matter, and whether the agency's decision was made pursuant to proper procedures, was based upon substantial evidence, was not arbitrary or capricious, and was not in violation of any constitutional, statutory or legal principle). The burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding who is asserting invalidity.

■ When a trial court is engaged in the process of determining whether an agency has violated the statute, the trial court does not conduct another "trial." I.C. § 4–21.5–5–11 (West 1990). The trial court proceeding is not intended to be a trial *de novo*, but rather a process in which the record as a whole is analyzed to determine whether the administrative findings are supported by substantial evidence. *Board of Trustees of the Pub. Employees' Retirement Fund of Ind. v. Mil-*

*ler* (1988), Ind., 519 N.E.2d 732, 733. The trial court, in reviewing the administrative action, has no right to weigh conflicting evidence and choose that which it sees fit to rely upon; the statute gives the fact-finding function to the administrative body. *Id.* Courts will not reverse or modify final administrative determinations unless contrary to law and unsupported by the evidence. *Indiana Dep't of Public Welfare v. Chair Lance Service, Inc.* (1988), Ind., 523 N.E.2d 1373. The trial court may not substitute its judgment for that of the administrative board, absent error of law. *Town of Beverly Shores v. Bagnall* (1992), Ind., 590 N.E.2d 1059. However, deference is not granted to an agency's legal conclusions. Law is the province of both the agency and the judiciary. Our constitutional system empowers the courts to draw legal conclusions. Recognizing this authority, the statute declares that "a reviewing court may set aside agency action 'not in accordance with law'...." *Miller*, 519 N.E.2d at 733 (citations omitted). When a party seeks judicial review of an agency action, the trial court's decision is appealable. I.C. § 4–21.5–5–16 (West 1990). The rules governing civil appeals from trial courts apply to appeals from judicial reviews of agency actions. *Id.* Before this Court, the DNR and Jarrett are in the position of parties appealing a trial court civil case holding. We review the trial court decisions to determine whether the trial court followed the law.

The issue before the trial court and now before this Court in this consolidated case is the specific question of whether the DNR possessed the statutory authority, pursuant to I–SMCRA, to place restrictions upon mining companies when pumping ground water from beneath property in which those companies have property rights.

In the *AMAX* case, the trial court declared that the NRC did not have the authority to impose Condition 12, which precluded AMAX from activating additional wells to dewater the strip mines "until sufficient detail is added to the statement of probable hydrological consequences to determine the effects that the dewatering may have on potential subsidences both within the permit and adjacent off-site areas." The trial court reversed the

final order of the NRC, and remanded to the agency for corrective action. In the *B & LS* case, the trial court enjoined the DNR from enforcing an order that limited B & LS's water pumping, again holding that the DNR did not have the statutory authority to interfere with water use rights. In the *B & LS* case, the trial court also noted that any interference with water rights would comprise an unconstitutional taking.

■ Clearly a state may, in the exercise of its police powers, impose restrictions upon certain types of land use. The United States Supreme Court has held restrictions on land use are constitutional, when the regulation "find[s] ... justification in some aspect of the police power, asserted for the public welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303, 310 (1926). The validity of I–SMCRA is not in question. Rather, the appellees contend (and the trial court agreed) that I–SMCRA does not convey to the DNR the authority to regulate ground water use.

## EXPRESS PROVISIONS

In providing primary authority to the DNR for its implementation, I–SMCRA includes numerous express provisions which directly apply to water resources protection and the prevention of offsite damage. For instance, a permit application shall include:

A determination of the probable hydrologic consequences of surface coal mining and reclamation operation, both on and off the mine site, with respect to the hydrologic regime, quantity and quality of water in surface and ground water systems ... and the collection of sufficient data for the mine site and surrounding areas so that an assessment can be made of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area and particularly upon water availability.

I.C. § 13–4.1–3–3(a)(11) (West supp.1993).

Before the DNR issues a permit for surface coal mining, a surface coal mine operator must submit a reclamation plan as part of the permit application. I.C. § 13–4.1–3–4(a) lists the required contents of that plan, including sections affecting ground water:

Each reclamation plan submitted as part of a permit application ... shall include, in the degree of detail necessary to demonstrate that reclamation required by this article can be accomplished:

.   .   .   .   .

(15) A detailed description of the measures to be taken during the surface coal mining and reclamation process to assure the protection of:

(A) the quality of surface and ground water systems, both onsite and offsite, from adverse effects of the mining and reclamation process;

(B) the rights of present users to that water; and

(C) the quantity of surface and ground water systems, both onsite and offsite, from adverse effects of the mining and reclamation process or to provide alternative sources of water where such protection of quantity cannot be assured.

I.C. § 13–4.1–3–4(a) (West supp. 1993). A DNR regulation, 310 IAC 12–3–32, specifies the nature and content of the information required in the permit application. The DNR's technical staff reviews the proposed mining operations and the expected consequences of the permittee's proposed mining operations before approving the permit. Before the DNR issues a surface coal mining permit, the permit applicant must submit a plan to assure the protection of ground water systems.

The statute also places the burden upon an applicant for a surface coal mining permit to establish the existence of certain conditions, including conditions aimed at preserving the hydrologic balance in the area surrounding that being mined:

The applicant has the burden of establishing that his application complies with all the requirements of this article. The director may not approve a permit or revision application unless the application affirmatively demonstrates and the director finds that:

.   .   .   .   .

(3) the assessment of the probable cumulative impact of all anticipated mining in the area on the hydrologic balance specified in [I.C. § ] 13–4.1–3–3 has been made by the director and the proposed operation thereof is designed to prevent material damage to the hydrologic balance outside the permit area....

I.C. § 13–4.1–4–3(a) (West supp.1993).[6] The reclamation plan requirement demonstrates the government's commitment to ensure that damage to the environment and to adjacent lands will be minimal. The permit application procedure also requires an assessment of the effects of mining operations on the hydrologic balance both within and outside the permit area.

I–SMCRA also imposes certain "performance standards," with which a surface coal mine operation must comply. I.C. § 13–4.1–8–1 contains certain general requirements that specifically deal with ground water:

In addition to any other standards which the rules of the commission may require compliance with by a permittee, a permittee shall do as follows:

．　　．　　．　　．　　．　　．

(10) Minimize disturbances to the prevailing hydrologic balance at the mine site and associated offsite areas and to the quality and quantity of water in surface and ground water systems during and after surface coal mining operations and during reclamation by:

．　　．　　．　　．　　．

(E) restoring recharge capacity of the mined area to approximate premining conditions;

．　　．　　．　　．　　．

(G) other actions required under the permit.

．　　．　　．　　．　　．

(25) Replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where such supply is affected by contamination, diminution, or interruption proximately resulting from such surface coal mine operation. Nothing in this article shall be construed as affecting in any way the right of any person to enforce or protect under applicable law the person's interest in water resources affected by a surface coal mining operation.

I.C. § 13–4.1–8–1 (West supp. 1993).[7] In addition, "[e]ach permit issued by the director is subject to conditions imposed by the director...." I.C. § 13–4.1–4–7 (West supp. 1993). DNR regulations more specifically list the required minimum standards for protecting the hydrologic balance. 310 IAC 12–5–16. A surface coal mine operation must conduct the mining in conformity with these standards; otherwise, the surface coal mine operator violates I–SMCRA.

Further, I–SMCRA specifically governs the conditions a surface coal mining operation must meet when affecting aquifers and the hydrologic balance of a mining area and the land adjacent to that area. Surface coal mining and reclamation operations that remove or disturb strata serving as aquifers which significantly ensure the hydrologic balance of water use, either on or off the mining site, must closely monitor the operation and regularly report the findings to the DNR. I.C. § 13–4.1–11–1.5 (West supp. 1993). The DNR also has a specific regulation regarding the monitoring of ground water, 310 IAC 12–5–27. When a surface coal mining operation affects or impacts the ground water system, the DNR requires extra caution.

When the DNR concludes that a surface coal operation endangers the environment, adjacent property owners, or the public's interest in general, the DNR is statutorily

---

**6.** The parallel federal provision is at 30 U.S.C.A. § 1260.

**7.** Paragraph 25 was amended in 1991 to include the following language:

"Nothing in this article shall be construed as affecting in any way the right of any person to enforce or protect under applicable law the person's interest in water resources affected by a surface coal mining operation."
I.C. § 13–4.1–8–1(25) (West supp. 1993).

empowered to halt the coal mining operations. That law states:

(a) If the director or inspector determines that:

(1) any condition or practice exists or a violation of this article or the commission's rules has occurred which creates an imminent danger to the health or safety of the public or is reasonably expected to cause significant, imminent environmental harm to land, air, or water resources . . .

.     .     .     .     .

the director shall order the cessation of surface coal mining and reclamation operations or the portion relevant to the condition, practice, or violation. In the order of cessation, the director shall determine the steps necessary to abate the violation in the most expeditious manner.

(b) Where the director or inspector finds that the ordered cessation of surface coal mining and reclamation operations, or any portion, will not completely abate the imminent danger to health or safety of the public or the significant imminent environmental harm to land, air, or water resources, the director shall, in addition to the cessation order, impose affirmative obligations on the operator requiring the director to take whatever steps the director considers necessary to abate the imminent danger or the significant environmental harm.

I.C. § 13–4.1–11–5 (West 1990). Finally, another DNR regulation requires surface coal mine operators to replace the water supply of a property owner who uses ground water, but whose use has been disturbed by the mining activity. 310 IAC 12–5–29.

■ The many statutes regarding the control over surface coal mining and the use of ground water indicate that the legislature, concerned with the affects surface coal mining has, wanted the DNR to govern such operations. In turn, the DNR promulgated many regulations, through the administrative rule making process, to aid in enforcing the statutes. These statutes and regulations specify the type of controls that the DNR possesses over surface coal mining operations and a surface coal mining company's use of ground water. The legislature expressly reserved the powers enumerated in I–SMCRA for the DNR. The DNR promulgated regulations through its enforcement arm, the NRC, to further refine those powers. We conclude that the DNR does have the express statutory authority to regulate and control surface coal mining, including a surface coal mine operator's use of ground water. We now examine the manner in which the DNR attempted to apply these statutes and regulations, in order to determine whether the agency acted within its authority.

■ In the *AMAX* case, the coal company submitted the required plan to preserve the hydrologic balance with its permit application. However, the NRC believed that the proposed plan was deficient, and conditioned approval of the permit pending further hydrologic studies. The NRC was not satisfied with the coal company's study of the possible consequences of the dewatering wells. Under I.C. § 13–4.1–4–3, the Director of the DNR may refuse to approve a permit application where the applicant has not met the burden of affirmatively demonstrating that the proposed operation is designed to prevent material damage to the hydrologic balance outside the permit area. We hold that the agency was acting within its statutory authority when it conditioned approval of the AMAX permit upon further hydrologic studies.

■ In the *B & LS* case, the DNR initially approved the permit that allowed B & LS to dewater its mine. At the time of the permit approval, the DNR believed that it did not possess the authority to regulate the coal company's use of ground water. Subsequently, in the *AMAX* case, the NRC held that the DNR was, as a matter of law, authorized by statute to regulate a strip coal mine operator's use of ground water. Following *AMAX*, the DNR made a retroactive determination that B & LS's application was not in compliance with I–SMCRA, and ordered B & LS to show either that B & LS operations would not cause damage as the result of the lowering of off-site water bodies, or that B & LS had purchased a right of entry to those

off-site lakes that allowed the lakes to be lowered. The DNR has the authority to require a permittee to revise or modify a permit, although the revision must be based upon a written finding and is subject to notice and hearing requirements. I.C. § 13–4.1–5–6 (West supp. 1993). The Director's order of May 17, 1991, instructed B & LS to obtain approval for a permit revision, with approval depending upon meeting one of two conditions. I–SMCRA allows suspension or revocation of the permit if the permittee does not revise the permit as required by the DNR. I.C. 13–4.1–5–8 (West supp. 1993). As with the *AMAX* case, we hold that the DNR was acting within its statutory authority when ordering B & LS to revise its permit.

### COMMON LAW WATER RIGHTS

Appellees AMAX and B & LS successfully argued to the trial court that I–SMCRA expressly preserves the common law water rights system that existed when I–SMCRA became effective. That right is stated in *Wiggins v. Brazil Coal and Clay Corp.* (1983), Ind., 452 N.E.2d 958. In *Wiggins*, a surface coal mining company was pumping water out of its mining pits. This draining of the mining pits caused a lowering of the water level of a lake located over several adjacent properties. The lake was formed when percolating ground water and surface waters filled an abandoned strip pit. The adjacent landowners sued the strip mining company for damages and injunctive relief for causing the loss of water from their lake. In affirming the coal company's right to pump water from its strip mining pit, this Court held:

> Water which percolates away underground through porous earth from beneath one lot to surrounding lands, no longer belongs to the owner of the lot. Such water is regarded as lost water and is considered at any given time to be part of the land with which it mingles.... Ground water is part of the land in which it is present and belongs to the owner of that land. It may be put to use to the fullest extent to further enjoyment of the land, however this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners.

*Id.* at 963–64. Appellees contend that *Wiggins* is the applicable law to be followed in the resolution of the present petition to transfer.

Appellees cite to a provision in I–SMCRA that appellees believe expressly preserves the *Wiggins* common law water rights system. The I–SMCRA provision that appellees cite reads:

> Nothing in this article shall be construed as affecting in any way the right of any person to enforce or protect under applicable law the person's interest in water resources affected by a surface coal mining operation.

I.C. § 13–4.1–8–1(25) (West supp. 1993). As previously noted, the Indiana legislature added this I–SMCRA language in 1986. The corresponding F–SMCRA provision, § 717(a), is virtually identical to the I–SMCRA provision, and is located at 30 U.S.C.A. § 1307(a). The trial court interpreted this I–SMCRA provision as absolutely prohibiting the DNR from setting forth any regulation of ground water use that contradicts state common law rights.

This SMCRA section has previously been the source of much litigation. The *AMAX* trial court cites two federal cases that the trial court believes to preserve the status quo of common law water rights. In those cases, the federal courts interpret 30 U.S.C.A. § 1307(a), the F–SMCRA provision that I.C. § 13–4.1–8–1(25) is based upon. In *Permanent Surface Mining Regulation Litigation II, Round III*, 620 F.Supp. 1519 (D.D.C. 1985), certain coal companies argued that they possessed protected water rights under state law that would not require them to replace all water sources under 30 U.S.C. § 1307(b). During this litigation, the Secretary of the Interior reinterpreted the federal regulation regarding 30 U.S.C. § 1307(a) as being deferential to state law:

> The Secretary agrees that § 717(a) [30 U.S.C. § 1307(a)] requires deference to State water law on questions of water use, and thus interprets § 717(b) [30 U.S.C. § 1307(b)] and the rule at issue as *not* requiring the replacement of water sup-

**428**

plies to the extent a surface coal mine operator consumes or legitimately uses the water supply under a senior water right determined under applicable State law.

*Perm. Surface Mining Reg. Litig. II, Rd. III,* 620 F.Supp. 1519. The federal district court upheld this interpretation.

In *National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988), the National Wildlife Federation argued that the Secretary's reinterpretation of the federal regulation regarding private water rights was contrary to the federal statute. The Federation contended that Congress intended to deny all property rights in ground water to coal operators, and intended to provide additional remedies to owners adversely affected by surface coal mine operations that abused water rights, beyond those remedies previously available under state common law. The U.S. Court of Appeals for the District of Columbia Circuit rejected the argument and upheld the Secretary's reinterpretation, noting that the federal statute "does not deprive anyone, including mine operators, of whatever rights to the use of water they had previously...." *Hodel,* 839 F.2d at 757 (affirming *Permanent Surface Mining Regulation Litigation II, Round III,* 620 F.Supp. 1519 (D.D.C.1985)). Moreover, throughout SMCRA, Congress expressed a concern for preserving existing property rights, and for not interfering with state determination of those rights. *Id.*

Appellees believe that the DNR does not have the right to interfere with the right to use the ground water located beneath their land, as defined by state common law, because the federal courts' interpretations of § 717(a) of F-SMCRA require deference to state law. The trial court agreed in *AMAX,* holding that "no provision within I-SMCRA was to affect in any way water rights." Appellees argue that SMCRA preserves the surface coal mine operator's rights in ground water, as defined in *Wiggins.*

The appellees' argument is based upon the mistaken assumption that I.C. § 13–4.1–8–1(25), the I-SMCRA provision in question, determines what the proper law to follow is. The I-SMCRA provision does not state what the "applicable law" is—what law the court should apply when deciding a water rights case. Rather, the I-SMCRA provision preserves any person's right to enforce an interest in water resources, without defining what the limits of that interest are. The federal cases defer the determination of the applicable law in all states. As *Hodel* notes, "It is not relevant to this analysis which [water rights] system a particular state follows; § 717(a) merely preserves for each party whatever rights state law allows." *Hodel,* 839 F.2d at 756, footnote 98. The conclusion that both I-SMCRA and F-SMCRA expressly preserve whatever water rights that state common law affords surface coal mine operators is a fallacy. Rather, the cited SMCRA provision expressly preserves a person's right to enforce or protect an interest in water resources that exists under applicable law. In order to determine what rights and interests exist, this Court now looks to what the "applicable law" is.

When this Court decided *Wiggins,* the I-SMCRA regulations specifically did not apply. The cause of action in *Wiggins* arose in 1977, but Indiana did not attain control over strip coal mining regulation until July 29, 1982. Consequently, in *Wiggins,* we did not consider whether the DNR possessed the statutory authority to issue regulations governing the use of ground water as part of strip mining operations. In *Wiggins,* we recognized that I-SMCRA was "presented as persuasive matter ... intended to persuade [the Court] that the public policy of the State is moving in the direction of recognizing that property in water should not be absolute in the owner of land where it is found." *Wiggins,* 452 N.E.2d at 962. We based our *Wiggins* decision solely on the application of Indiana's traditional ground water law, not I.C. § 13–4.1. We disagree with appellees' contention that *Wiggins* is the "applicable" law that denies the DNR authority to regulate their use of ground water.

■ Appellees AMAX and B & LS argue that despite the clear language used by the legislature in providing statutory authority for the DNR to regulate their use of ground water, we should read the 1986 legislative amendment to I.C. § 13–4.1–8–1(25) as a complete nullification of these statutory provisions presented above. We disagree.

Such a conclusion contradicts other portions of I–SMCRA, which explicitly reserves such powers for the DNR. The legislative intent as ascertained from an act as a whole will prevail over the strict literal meaning of any word or term used therein. When called upon to construe a single section of a statute, we construe that section with due regard for all other sections of the act and with due regard for the intent of the legislature in order that the spirit and purpose of the statute be carried out. *Park 100 Dev. v. Indiana Dep't of State Rev.* (1981), Ind., 429 N.E.2d 220. Had the legislature intended such a result, it simply could have repealed any of the previously cited authority for the DNR's regulation of ground water.

Our decision today does not eliminate the Indiana property rights to ground water. Rather, we recognize another restriction, one the legislature added, on the doctrine of absolute use of ground water. The State can regulate the use of property without destroying rights in that property. Our decision finds its roots in the seminal Supreme Court decision *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926):

> Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day.... And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.

> The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions.

*Amber Realty,* 272 U.S. at 387, 47 S.Ct. at 118, 71 L.Ed. at 310. The right itself still exists, but the manner in which the State protects the right has changed.

## CONSTITUTIONAL CLAIM

■ Appellee B & LS next claims that by regulating its use of ground water as part of their strip mining operations, the DNR has effected an unconstitutional taking of their property rights in the ground water.

The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use, without just compensation. U.S. Const. amend. V. The United States Supreme Court has interpreted the Public Use Clause of the Fifth Amendment to mean that one private citizen's property may not be taken for the benefit of another private citizen without a justifying public purpose. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186, 197 (1984). In *Midkiff,* the Court noted that "[t]he 'public use' requirement is ... coterminous with the scope of the sovereign's police powers." *Id.* at 240, 104 S.Ct. at 2329, 81 L.Ed.2d at 197. Further, the U.S. Supreme Court "has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.' " *Id.* (citing *United States v. Gettysburg Electric R. Co.,* 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896)). If the legislature's pronouncement of the purpose for the taking is reasonable, this Court will generally defer to the legislature's judgment that the use is public.

As has been observed, ground water is often mobile, moving about over great distances throughout the strata of the earth. Gross consumption and pollution of ground

water has the potential of great harm to private property owners, communities, and the environment. The legislature enacted I–SMCRA to regulate conduct that has the potential for harm. In both cases, the DNR's actions were done pursuant to the enforcement of the Act. We hold that such controls are within the realm of the state's police power, which is generally exercised to protect the health, safety, and welfare of the general populace. Because this is a legitimate exercise of the police power, we also find that the DNR's action constituted a public use in compliance with public use component of the Fifth Amendment Takings Clause.

■■■ Appellee B & LS also advances a regulatory taking claim. A taking is recognized not only for the physical seizure or invasion of property by the government, but also when government regulations have the effect of impinging upon a vested property right. *See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 316–17, 107 S.Ct. 2378, 2386–87, 96 L.Ed.2d 250 (1987). In deciding whether a regulation effects a taking in violation of the Fifth Amendment, this Court applies the following test, gleaned from U.S. Supreme Court jurisprudence: a land use regulation will not effect a taking if it substantially advances a legitimate state interest and does not deprive an owner of economically viable use of his property. *DNR v. Indiana Coal Council, Inc.* (1989), Ind., 542 N.E.2d 1000 (citing *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677, 687 (1987)).

The challenge here is not read in terms of the DNR's action denying economically viable use of the property, although B & LS argues that the DNR's change in interpretation of I–SMCRA and the regulations promulgated under it "retroactively abolished the investment-backed expectations of the property owners, elicited by the DNR's prior position." In discussing the state's legitimate interest test, this Court has said:

> The essence of the first prong of the test is whether government had the right to exercise its police power in the manner it did, regardless of the burden to the prop-

erty. . . . If the regulation does not bear a substantial relation to the legitimate ends sought to be achieved, either through a failure of the statute as a whole to serve those ends or as applied to a particular piece of property, then the exercise of the police power is deemed to be unreasonable.

*Indiana Coal Council,* 542 N.E.2d at 1003 (citation omitted).

In the *AMAX* case, the DNR's action expressly tracks the purpose of I–SMCRA. We have already discussed the legitimacy of the purposes of the statute: the state is applying the police power to protect from harm. The action the DNR took, adding a condition to the permit, was intended to prevent offsite damage via the dewatering process. The DNR action in this case looked to further the ends of I–SMCRA. This was a legitimate exercise of the statutory authority, authorized in I–SMCRA, to bring about actions that would protect nearby landowners from the harmful effects of surface coal mining, specifically the change in the hydrologic balance.

■■■ In the *B & LS* case, the DNR offered B & LS two separate alternatives: 1) show no damages would result from the dewatering activities; or 2) pay for a right of entry. The first alternative is similar to the condition imposed in the *AMAX* case, and is therefore a legitimate action that advances the state interest. Appellee argues that the second option the DNR offered is problematic, because it does not advance the state's interest in preventing environmental damage. Appellee argues that in effect, the option allows the coal companies to purchase the right of entry and do whatever damage they see fit. Voluntary compliance with the second option would advance a legitimate state interest by protecting the adjacent landowners' competing rights to the water. Therefore, we hold that there was no impermissible regulatory taking. The DNR's actions substantially advanced legitimate state interests.

The agency action in both of these cases was valid and in accordance with law and should not have been disturbed by the trial court. The judgment in the *AMAX* case is

reversed with instructions to grant judgment for Jarrett and the NRC/DNR, upholding agency authority to regulate withdrawal of ground water to include the protection of adjacent areas. The judgment in the *B & LS* case is reversed with instructions to grant judgment for the NRC/DNR and other defendants.

SHEPARD, C.J., and SULLIVAN, J., concur.

GIVAN, J., dissents. The trial court and the Court of Appeals were correct.

DICKSON, J., dissents without opinion.