Wendella BRANT, et al., Appellants–Intervenors,

v.

CUSTOM DESIGN CONSTRUCTORS CORP., a/k/a CDC Corporation, F. Blake Wallace and Janet L. Wallace, Boone County Area Plan Commission, Appellees–Petitioners/Respondents.

No. 06A05–9603–CV–92.

Court of Appeals of Indiana.

March 19, 1997.

Michael K. Sutherlin, Frank C. Capozza, Katz & Korin, Indianapolis, for Appellants.

Kent M. Frandsen, Parr Richey Obremskey & Morton, Lebanon, for Appellees.

## OPINION

SHARPNACK, Chief Judge.

Wendella Brant and the other intervenors in this cause (collectively the "appellants") appeal the order of declaratory judgment and mandamus in favor of Custom Design Constructors Corporation, a/k/a CDC Corporation, F. Blake Wallace, and Janet Wallace (collectively "CDC") on CDC's application for subdivision approval. The appellants raise two issues for our review which we restate as:

1) whether the trial court erroneously issued an order of mandamus requiring the Area Plan Commission (the "commission") to grant CDC's application for subdivision approval; and

2) whether the trial court erroneously issued an order of mandamus requiring the commission to grant a street variance with respect to the subdivision plans.

We reverse and remand with instructions.

### FACTS

The facts most favorable to the judgment follow. Blake and Janet Wallace own a tract of real estate containing approximately 321 acres in Boone County. The real estate is primarily unimproved timberland and farmland and contains a 32 acre lake. The Wallaces entered into a contract with Custom Design Constructors Corporation, a/k/a CDC Corporation, to develop the real estate into a residential subdivision known as Pennsbury, which would contain approximately 250 single family dwelling lots and common areas.

The real estate is in the agricultural zoning district pursuant to the Boone County Comprehensive Zoning Ordinance. A residential subdivision is permitted in such a district subject to compliance with the provisions of the Boone County Subdivision Control Ordinance (the "ordinance").

On February 1, 1995, CDC filed its application for approval of a primary plat for Pennsbury with the commission. Pursuant to Ind.Code § 36–7–4–200 et seq., the six person commission is vested with the exclusive authority to receive, consider and approve or disapprove applications for residential subdivisions in Boone County. As part of its plat application, CDC also requested that the commission grant a variance in the maximum distance by which a cul-de-sac street could extend beyond the last intersecting street.

The question of whether to grant the Pennsbury subdivision was considered at four of the commission's public hearings. At the third meeting on May 3, 1995, the commission's vote was split equally on whether to approve CDC's application. The application

was again addressed at the June 5, 1995, meeting, during which additional evidence and public comment were presented. At this meeting, the commission again split equally. Another motion offered that evening for approval of both the plat and the street length variance also resulted in a tie vote. Following those votes, the commission chair expressed the opinion that the members were deadlocked on the application. The three commission members who opposed plat approval expressly stated that further information, comments, and plat revisions would not change their vote. As a result, the application was not placed on the agenda for the next meeting, and the commission took no further action with regard to primary plat approval for Pennsbury.

On June 19, 1995, CDC filed a "Verified Petition for Writ of Certiorari, Declaratory Judgment and Writ of Mandamus" against the commission. Record, pp. 6–12. On June 20, 1995, the appellants filed a petition to intervene, which was granted on June 21, 1995.

On September 27, 1995, the trial court conducted a hearing. On October 30, 1995, the trial court entered its findings of fact and conclusions thereon. In its order, the trial court found that CDC satisfied the requirements of the subdivision ordinance and ordered the commission to approve CDC's application, including the request for a street length variance. The appellants now appeal the trial court's order.

### STANDARD OF REVIEW

Initially, we note that a mandate is an extraordinary remedy, expressly provided for by statute, which may be sought against a public officer to compel performance of any act which the law specifically enjoins or any duty resulting from any office, trust or station. I.C. § 34–1–58–1. A party requesting mandate must have a clear and unquestioned legal right to the relief sought and must show that the respondent has an absolute duty to perform the act demanded. *State ex rel. J.A.W. v. Indiana Juvenile Parole Comm.*, 585 N.E.2d 729, 730 (Ind.Ct.App. 1992); *Butler v. Heffelmire*, 548 N.E.2d 1217, 1218 (Ind.Ct.App.1990).

### DISCUSSION

The first issue for our review is whether the trial court erroneously issued an order of mandamus requiring the commission to grant CDC's application for subdivision approval. The appellants assert:

> "The trial court erred when it found as a matter of law that the approval of the primary plat of the Pennsbury subdivision was a mechanical ministerial act required of the Commission, and therefore, the Commission's failure to act and approve the primary plat was subject to a writ of mandamus.... In other words, the issue before this Court is whether the Commission is merely a rubber stamp for subdivision developers that comply with Section 3.3 of the Boone County Subdivision Ordinance or whether the Commission must determine if a proposed subdivision complies with the *entire* Boone County Subdivision Ordinance...."

Appellants' brief, p. 29 (emphasis added). The essence of the appellants' claim is that the trial court erred by finding that the granting of approval is a ministerial act limited to determining whether the proposed plat complies with the procedural and technical requirements of Article III, § 3.3 of the ordinance[1] rather than whether the plat

---

1. Section 3.3 of Article III states:

  A. The primary plat shall be required in accordance with Article III of this Ordinance.

  B. The plat shall be drawn at a scale of 50 feet to 1 inch, except that when the drawing at that scale requires more than one sheet, the plat may be drawn at a scale of 100 feet to 1 inch. Sheets shall not exceed 24 inches by 36 inches in size.

  C. The primary plat shall be prepared and certified by a land surveyor and/or a professional engineer registered by the State of Indiana.

  D. The plat shall include a location map showing the following:

    1. Location of proposed subdivision.

    2. Existing subdivisions and parcels of land adjacent to the proposed subdivision.

    3. Existing schools, parks, playgrounds, or other similar facilities that will serve the proposed subdivision.

    4. All public thoroughfares up to and including Primary Thoroughfares established by this Ordinance, that will serve the proposed subdivision.

complies with the entire ordinance. The appellants argue that the trial court ignored requirements set forth in other parts of the ordinance.

■ CDC's application requesting primary plat approval for the proposed subdivision was governed by the "Subdivision control" provisions found in I.C. § 36–7–4–700 *et seq.* Pursuant to this statute, the local legislative body must adopt an ordinance which regulates the subdivision of land in its zoning districts and which provides "concrete standards." I.C. § 36–7–4–702; *Cundiff v. Schmitt Dev. Co.,* 649 N.E.2d 1063, 1066 (Ind.Ct.App.1995). The purpose of these standards is to provide protection to both developers and landowners and to give "fair warning as to what the local plan commission would consider when reviewing a preliminary plat." *Burrell v. Lake County Plan Comm'n,* 624 N.E.2d 526, 530 (Ind.Ct.App.

1993), *trans. denied.* In deciding whether to grant an application for primary plat approval under this scheme, the commission is required to "determine if the plat or subdivision qualifies for primary approval under the standards prescribed by the subdivision control ordinance." I.C. § 36–7–4–702(a). If, after a hearing, the plan commission determines that the application and plat comply with the standards in the subdivision control ordinance, then it shall make written findings and a decision granting primary approval to the plat. I.C. § 36–7–4–707.

■ Approval of a plat which meets the requirements of the applicable ordinance constitutes a ministerial as opposed to a discretionary act. *Cundiff,* 649 N.E.2d at 1069; *Knutson v. State ex rel. Seberger,* 239 Ind. 656, 659, 157 N.E.2d 469, 471 (1959), *reh'g denied,* 239 Ind. 656, 160 N.E.2d 200. In

5. The location of any streets and alleys in the proposed subdivision showing the relationship of said streets to any existing or proposed streets in contiguous subdivisions or undeveloped property to produce the most advantageous development of the entire neighborhood.

The location map may be prepared by indicating the data by notation on available maps of an appropriate scale.

E. A primary subdivision plat shall be submitted showing the following:

1. The proposed name of the subdivision.
2. Names and addresses of the owner, subdivider, and consulting engineer, land surveyor, or planning firm who prepared the plan.
3. Legend notes including the scale, north point, and date.
4. Tract boundary lines showing dimensions, bearings, angles, and references to section, township, and range lines or corners.
5. Existing zoning of the tract and all contiguous tracts surrounding the proposed subdivision.
6. All section and municipal corporate boundaries lying within or contiguous to the tract.
7. Topographic contours at typical intervals of one foot if the general slope of the tract is less than 5″, or intervals of two feet if the slope is in excess of 5%. Said contours shall be referenced to mean sea level elevations.
8. Layout of lots showing dimensions and numbers and square footage of each lot.
9. Building lines showing setback dimensions throughout the subdivision.
10. Parcels of land proposed to be dedicated or reserved for schools, parks, playgrounds or other public, semi-public or community purposes.

11. Streets and rights-of-way on and adjoining the site of the proposed subdivision showing the names, roadway, widths, approximate gradients, types and widths of pavements, curbs, and sidewalks.
12. Existing and proposed easements including the location, width, and purpose of such easements.
13. Location, size, and capacity of any public sewer and/or water facilities, if such facilities are available.
14. Location of natural streams, regulated drains, flood plains, pipelines, power lines, etc.
15. A description of the surface drainage system to an approved outlet, including date showing that said outlet is adequate to accommodate the drainage requirements of the finished subdivision. Arrows designating the general drainage of all streets and lots shall be included.
16. Location of any subsurface drainage required under the Boone County Sewage and Drainage Ordinance and any amendments thereto, showing the location of all easements and all data pertaining to the size and capacity of such drainage.
17. If the primary plat is to be divided into sections or phases of development, the boundaries and numbers of such sections shall be shown.
18. Protective covenants which are properly prepared and legally sound shall be incorporated in the plat, subject to the approval of the Commission.
19. A landscaping/screening plan shall be incorporated in the primary plat design plans when requested by the Plan Director or the Area Plan Commission.

Record, pp. 371–372.

other words, if the proposed plat meets the "concrete standards" of the subdivision control ordinance, then "the approval or disapproval of the plat on the basis of the controlling standards is a ministerial act." *Knutson,* 239 Ind. at 659, 157 N.E.2d at 471; *see Cundiff,* 649 N.E.2d at 1069; *Johnson County Plan Comm'n v. RamsHead Corp.,* 463 N.E.2d 295, 304 (Ind.Ct.App.1984); *Tippecanoe County Area Plan Comm'n v. Sheffield Developers, Inc.,* 181 Ind.App. 586, 601, 394 N.E.2d 176, 186 (1979); *Dosmann v. Area Plan Comm'n,* 160 Ind.App. 605, 611, 312 N.E.2d 880, 884 (1974).

Thus, the precise question before us is whether the trial court considered all of the "concrete standards" in the ordinance before it performed its ministerial duty of approving CDC's application. In its order, the trial court found in part:

> "To the extent Boone County authorities have enacted concrete standards for the granting of primary plat approval, they are set forth in Article III of the Subdivision Ordinance, specifically in section 3.3 of that article. It is undisputed that the procedural requirements of such article, relating to preapplication, communication, filing of the appropriate application, payment of the required fee, and giving of public notice, have been satisfied by petitioners. The required contents of the plat are identified in section 3.3 and have also been satisfied by judicial admission. . . .

> \* \* \* \* \*

> Petitioners also presented to the Plan Commission information on matters such as traffic flows and the impact of the subdivision on are thoroughfares, the nature and operational characteristics of the proposed sanitary sewer system, the subsurface aquifer in the area, the nature and operational characteristics of the proposed water utility, and the preliminary plans for surface and subsurface drainage in the subdivision. However, the Subdivision Ordinance *does not contain standards relating to those matters which are relevant or which must be satisfied at the primary plat stage."*

Record, pp. 115–116 (emphasis added). The trial court's order indicates that it found Article III, § 3.3, to the exclusion of the other articles in the ordinance, to constitute the only prerequisites necessary to receive approval for an application.

The appellants contend that "[c]ontrary to the finding of the trial court, merely complying with the procedural portion of Article III, Section 3.3, is not a sufficient basis for Commission approval of a primary plat." Appellants' brief, p. 32. Rather, the appellants claim that the trial court "completely ignored" other sections of the ordinance which set forth clear standards that developers must meet to gain approval for primary plats of proposed subdivisions. Specifically, the appellants cite Article I, § 1.1, Article III, § 3.1(B), Article VI, § 6.0, and Article VI, § 6.6 as provisions that the trial court erroneously ignored.

▪ First, the appellants contend that the trial court erroneously failed to consider Article I, § 1.1 as a requirement necessary for gaining approval for a subdivision. This section states:

> "1. The purposes of these subdivision regulations are to protect and promote the public health, safety, and general welfare, and to provide for:

> a. Guidance of future growth and development in accordance with the comprehensive planning process.

> b. Protection of the character and the social and economic stability of all parts of the area, and to encourage the orderly and beneficial development of all parts.

> c. Protection and conservation of the value of land, buildings, and other improvements upon the land, and to minimize the conflicts among the uses of land and buildings.

> d. Avoidance of scattered and uncontrolled subdivision of land that would result in the unnecessary imposition of an excessive expenditure of public funds for the supply of services that are a part of community infrastructure.

e. Establishment of reasonable standards and procedures for subdivisions and resubdivisions, in order to further the orderly layout and use of land; and to insure proper legal descriptions and monumenting of subdivided land.

f. Prevention of the pollution of air and water; provision of drainage facilities and the safeguarding of the water table; and the encouragement of wise use and management of natural resources in order to preserve the integrity, stability, natural beauty and topography, and the value of land."

Record, pp. 368–369. Article I is entitled "Purposes and Objectives of the Ordinance," while § 1.1 is entitled "Objectives." As these titles suggest, the items listed are only the goals of the ordinance. In substance, the section merely references the planning objectives that the legislative body used to craft the rules and standards for subdivision control which follow in the ordinance.

In *Tippecanoe*, we considered and rejected the Tippecanoe County Plan Commission's argument that a similar preamble in its ordinance constituted standards upon which a plat could be denied. *Tippecanoe*, 394 N.E.2d at 186–187. In that case, the plan commission appealed the trial court's mandate to grant primary plat approval based upon compliance with the standards of the ordinance. Section 1.1 of that ordinance, entitled "Purpose and Objectives of the Ordinance," contained general reference to the county's objectives in adopting the ordinance and the benefits to all citizens of proper subdivision regulation. *Id.* 394 N.E.2d at 186.

After reviewing that language, we held:

"Testimony of certain witnesses notwithstanding, we are completely unable to glean from § 1.1 any specific or concrete standards by which a proposed plat may be judged. The clear import of the fourth and last paragraph in § 1.1 is that subsequent sections of the Subdivision Control Ordinance contain the standards and requirements by which a plat's compliance will be judged. Indeed, even the title of

§ 1.1 ... negates the Plan Commission's argument regarding concrete standards. To find § 1.1 contains sufficiently specific and concrete standards would be to frustrate the public policy arguments enunciated in *Knutson*, 239 Ind. 656, 157 N.E.2d at 471, requiring that the Plan Commission's 'authority be exercised in a standardized and clearly defined manner so as to enable both the landowner and the municipality to act with assurance and authority regarding the development of such areas.' ... We find that § 1.1 in no way gives the requisite fair warnings as to what the agency will consider in making its decision and we, therefore, hold the trial court correctly held § 1.1 may not be utilized as grounds for disapproval."

*Id.* 394 N.E.2d at 186–187.

Similar to the preamble in the Tippecanoe ordinance, the language of § 1.1 in the ordinance before us is general, containing no specific standards by which a proposed plat may be judged. In addition, the article as a whole suggests that the standards and requirements by which a plat's compliance would be judged are contained in the rest of the ordinance. As a result, the section does not contain "concrete standards" and does not contain anything which gives the public fair notice as to what will be required for any given parcel of land to be subdivided. *See Cundiff*, 649 N.E.2d at 1066. Therefore, the trial court properly excluded this section from its determination of whether CDC satisfied the requirements of the ordinance.

■ However, the other articles and sections cited by the appellants do contain "concrete standards" and should have been considered by the trial court. Article III of the ordinance contains the procedure which must be followed to gain approval by the commission. The first paragraph of § 3.1 of this article discusses the application procedure and outlines the specific requirements for submitting a preliminary plat. The next paragraph states:

"No land shall be subdivided for residential use unless adequate access to the land over approved streets or thoroughfares exists or will be provided by the subdivider,

or if such land is considered by the Commission to be unsuitable for such use by reason of flooding or improper drainage, objectionable earth and rock formations topography, or any other feature harmful to the health and safety of potential residents and the community as a whole." Record, p. 370. We find that this paragraph contains language of sufficient specificity to provide the public fair notice as to what will be required for any given parcel of land to be subdivided. *See Cundiff,* 649 N.E.2d at 1066. Because the language sets forth these specific requirements, we hold that Article III, § 3.1 constitutes a "concrete standard" that the trial court must consider in ruling on a subdivision application. *See id.* Therefore, the trial court should have considered this section when it determined whether CDC satisfied all of the requirements in the ordinance.

Next, the appellants contend that the trial court ignored two sections of Article VI, which is entitled "Principles and Standards of Design." Section 6.0 of this article states:

"A.   In determining whether an application *for approval of a primary plat or a secondary plat* of a subdivision shall be granted, the Commission shall determine that the plat is in accordance with the principles and standards required in this Article which shall be deemed as minimal; and whenever the applicable requirements of other ordinances adopted by the County are higher or more restrictive, those requirements shall control any application for plat approval.

\* \* \* \* \*

C.   Due consideration shall be given to the prevention of air and stream pollution, proper treatment and disposal of refuse and other waste, and the elimination of other blighting characteristics.

D.   The subdivision layout shall be of such a character that it protects the health, safety, and general welfare of the residents in the jurisdiction of the Commission."

Record, p. 389 (emphasis added). Section 6.6 of this article states:

"A.   Land which exhibits severe limitations to urban development due to flooding, inadequate drainage, poor soils, or other features likely to be harmful to the safety, welfare, and general health of future residents, shall not be subdivided, unless adequate remedies to overcome said limitations are formulated by the subdivider and approved by the Commission and other appropriate public agencies.

B.   Land which exhibits very severe limitations to urban development, such as flood plains and very poorly drained organic (muck) soils, characterized by seasonal high water tables at or near the surface, ponding, or frequent to occasional flooding, shall not be platted for urban development or used for non-agricultural structures."

Record, p. 395.

Based on our review of this article, we conclude that the trial court should have considered whether CDC satisfied the requirements set forth therein. The first sentence of the article states that when determining whether an "application *for approval of a primary plat or a secondary plat* of a subdivision" will be granted, the commission "shall" determine that the plat is in accordance with the principles and standards required in "this Article." Record, p. 389 (emphasis added). In other words, this language specifically requires the commission to consider the principles and standards in the article when reviewing an application for primary approval. Moreover, this article contains language of sufficient specificity to constitute a "concrete standard" that would provide the public fair notice of what will be required for any given parcel of land to be subdivided. *See Cundiff,* 649 N.E.2d at 1066. Accordingly, the trial court should have considered whether CDC satisfied the requirements set forth in this article before concluding that approval should be granted.

Therefore, the trial court failed to consider all of the requirements for CDC to

satisfy before it mandated that the commission approve CDC's application. Consequently, the trial court's order of mandamus was erroneous because CDC failed to establish that it had a clear and unquestioned legal right to the relief sought and that the commission had an absolute duty to approve its application. *See Butler*, 548 N.E.2d at 1218. Accordingly, we reverse the trial court's judgment ordering the commission to approve the application. In addition, we instruct the trial court to conduct further proceedings necessary to determine whether CDC's application satisfied all of the requirements set forth in the ordinance.[2] If, upon reconsideration, the trial court specifically finds that CDC satisfied all of the requirements, then it may reissue an order of mandamus for the commission to approve the application.

Next, we will address the question of whether the trial court erroneously issued a mandamus ordering the plan commission to grant a street variance because the issue is likely to reappear on remand. The appellants argue that the trial court erred by ordering the commission to grant CDC a street variance because CDC did not have a "clear and unquestioned legal right" to the variance. *See id.*

■■■■■ Article VIII, § 8.0 of the ordinance governs variances for subdivisions. This section provides:

"Where the subdivider can show that a provision of this Ordinance would cause unnecessary hardship if strictly adhered to and where, in the opinion of the Plan Commission because of topographical or other conditions peculiar to the site, a departure may be made without destroying the intent of such provisions, the Plan Commission *may* authorize a variance. Any variance thus authorized is required to be entered in writing in the minutes of the Commission and the reasoning on which the departure was justified shall be set forth."

Record, p. 402 (emphasis added). This section clearly states that the commission "may" authorize a variance as opposed to "must" or "shall." Thus, the decision to authorize the variance was within the discretion of the commission. Orders of mandamus will not be granted to control the discretionary action of a public officer, board or commission. *Tippecanoe*, 394 N.E.2d at 180. Consequently, CDC had no "clear and unquestioned legal right" to the variance, and the commission had no "absolute duty" to grant it. *See Butler*, 548 N.E.2d at 1218. Therefore, the trial court erred by issuing a mandamus order requiring the commission to authorize the variance rather than allowing the commission to reconsider the variance in light of the order to approve the application.

In conclusion, we find that the trial court failed to consider all of the elements in the ordinance which must be satisfied before approval of the application is required. Accordingly, we reverse the trial court's mandate that the commission grant approval. We instruct the trial court to reconsider all of the requirements before reaching the conclusion that primary plat approval must be granted. Finally, because the decision of whether to grant a variance is within the commission's discretion, we find that the trial court erroneously ordered the commission to grant the variance and similarly reverse that order of mandamus.

For the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded with instructions.

BARTEAU and ROBERTSON, JJ., concur.

---

**2.** Our discussion is limited to only those provisions cited by the appellants as having been ignored by the trial court. Our conclusion that the trial court had to consider all of them except Article I, § 1.1 is not meant to imply that these are the only additional provisions in the ordinance the trial court must consider.