**VAN VACTOR FARMS, INC.,
Appellant–Petitioner,**

v.

**MARSHALL COUNTY PLAN COMMISSION, Ralph Booker, Clifford Allen, David Dinius, Larry Fisher, Fred Lintner, Ronnie McCartney, Wayne Neidlinger, and Max Watkins, Appellees–Respondents.**

No. 50A03–0209–CV–326.

Court of Appeals of Indiana.

Aug. 20, 2003.

Robert J. Palmer, John H. Peddycord, May, Oberfell & Lorber, South Bend, IN, Attorneys for Appellant.

George T. Patton, Jr., Paul D. Vink, Bose McKinney & Evans LLP, Indianapolis, IN, Kenneth H. Lukenbill, Stevens, Travis, Fortin & Lukenbill, Plymouth, IN, Attorneys for Appellees.

Charles R. Shedlak, Susan R. Hanson, Tuesley & Hall LLP, South Bend, IN, Attorneys for Amicus Curiae Twin Lakes Concerned Citizens Group.

## OPINION

KIRSCH, Judge.

Van Vactor Farms, Inc. ("Van Vactor") appeals the trial court's denial of relief on its petition for writ of certiorari following the Marshall County Plan Commission's ("the Commission") denial of its application for preliminary plat approval for a proposed subdivision. Van Vactor raises a number of issues on appeal, which we consolidate and rephrase as:

I. Whether the Marshall County Subdivision Control Ordinance provisions relied upon by the Commission to deny the preliminary plat approval were sufficiently specific and concrete and not extrinsic to the ordinance so as to provide Van Vactor fair notice of what would be required for the parcel of land to be subdivided.

II. Whether the evidence was sufficient to support the Commission's determination.

III. Whether the Commission's decision was illegal, arbitrary and capricious.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In June 2000, Van Vactor filed its original application for preliminary plat approval of a subdivision to be named "Prairie Meadows." The subdivision was to be located on farmland owned by Van Vactor, which was zoned agricultural with a provision allowing single-family dwellings to be built. The subdivision was to be located on land situated in the countryside of Marshall County and adjacent to Olive Trail, which runs north and south on the eastside of the land, and 12th Road, which runs east and west on the southside of the land. Both roads are two-lane rural roadways used frequently by farmers to transport farm machinery and which provide the only access to the proposed subdivision. Several lakes, including Myers Lake and Lawrence Lake, are located on the south side of 12th Road, directly opposite the proposed subdivision site.

The Commission conducted several hearings and received a large amount of evidence in the eight-month period that it considered Van Vactor's application. Of particular concern to the Commission was evidence that the roadways could not safely accommodate additional traffic, that a risk of groundwater contamination existed due to septic tank use, and that there were risks associated with the application of wastewater sludge on the farmland for many years.

In denying the application, the Commission issued the following relevant findings of fact and conclusions:

Findings of Fact

* * * *

■ (A) In accordance with § 501.4 and § 501.5(d) of the Marshall County Subdivision Ordinance, the public roads, to-wit: Olive Trail and 12th Road, serving the proposed subdivision are inadequate and dangerous. The traffic count determined by the Marshall County Highway Department as submitted by the applicant is 3266 vehicles per day. The estimated added vehicles generated by the subdivision is 1040, or a total of 4306 vehicles per day, representing a thirty percent (30%) increase in volume. The current design standards for that volume of traffic would require two (2) twelve foot (12') driving lanes and six foot (6') or eight foot (8') shoulders as stated in the plan director's staff report. These roads, namely, Olive Trail and 12th Road, are not designed to carry the increased volume of traffic as proposed by the applicant. The traffic counts as submitted by the applicant, indicate that the roads would have to be widened and improved, in order to safely handle additional traffic. This is also an agriculturally zoned area, and slow moving agricultural equipment, which utilize Olive Trail and 12th Road, would be particularly jeopardized by the increased flow of traffic.

(B) In accordance with § 501.3 and § 501.4 of the Marshall County Subdivision Control Ordinance, 109 individual on-site septic systems on 170.8 acres as proposed gives rise to potential ground water contamination. The long-term effects of large numbers of private, individual septic systems constitute a hazard to the health and safety of the community because septic systems have been found to fail over time, causing wastewater to infiltrate the groundwater of the area. The existing sand and gravel found in the Riddles soil type prevalent in this development allows groundwater to move more readily, resulting in an even increased risk of ground contamination.

(C) In accordance with § 501.3 and § 501.4 of the Marshall County Subdivision Control Ordinance, the proximity of the sludge produced and applied from the City of Plymouth's Waste Water Treatment Plant endangers the public health, safety and welfare of residents using the sludge application land. Two studies, *"A Case for Caution: Recommendations for Land Application Of Sewage Sludges and An Appraisal of the U.S. EPA's Part 503 Sludge Rules,"* 1999 by Ellen Z. Harrison, Murray B. McBride and David B. Bouldin, Cornell Waste Management Institute; and *"The Issue of Sludge Deposit on Land,"* 1988 by Dr. D.J. Lisk, Cornell University; were presented to the Plan Commission indicating sludge has been shown to contain toxic levels of heavy metals, pathogens and pesticides which are harmful to human beings.

(D) The Land Use section of the Marshall County, Indiana, Comprehensive Plan, pages 5–8 and 14–21, requires that:

* Residential development shall be located in and around existing cities and towns of the county;

* In the agricultural areas of the county as shown on the Land Use Plan, a rural density of residential development should be maintained;

* The provision of public services, such as sanitary sewer and water systems, fire protection, and street lights will be supported in the areas shown on the Land Use Plan and discouraged in the agricultural areas;

* Higher standards of development and improved patterns of development will be encouraged in the areas around the lakes[.]

(E) The proposed subdivision fails to comply with the minimum roadway infrastructure as set out in § 222.4, § 222.5, § 222.6 and § 222.7, § 502.1. and § 602.1(a) and (b), specifically § 222.5, *"Local Roads"*, being the access and principal arteries of the subdivision (i.e.) sixty foot (60') right-of-way § 502.1 and twenty foot (20') paved § 602.1(a); § 222.4 *"Minor Collector Roads"* are moderate capacity thoroughfares designed to accommodate relatively low speed traffic. Two moving lanes unseparated, but wider than local road lanes, are required, i.e. § 502.1 and 602.1(i.e.) seventy foot (70') right-of-way and 502.1(sic), twenty-two foot (22') paved 602.1(b).

## Conclusions of Law

1. Under § 501.4 and § 501.5(d) of the Marshall County Subdivision Control Ordinance, the proposed subdivision's circulating systems and land patterns conflict with the efficiency of bordering Olive Trail and 12th Road in that these roads were not designed and built to safely carry the proposed increase in the volume of traffic, and hence would be dangerous and detrimental to the public safety.

2. Under § 501.3 and § 501.4 of the Marshall County Subdivision Control Ordinance, proper consideration has not been given to the prevention of stream pollution, proper treatment and disposal of refuse and other wastes in that the 109 on-site septic systems would pose a long-term threat to the area's groundwater, and hence public health, safety and general welfare.

3. Under § 501.3 and § 501.4 of the Marshall County Subdivision Control Ordinance, the subdivision's layout is of such a character that it does not protect the health, safety and general welfare of

the county and its residents in that the existence of applied wastewater sludge poses a health risk to the public health, safety and general welfare.

4. Under §§ 222.4–222.7 and 501.1 of the Marshall County Subdivision Control Ordinance, the proposed plat does not conform to the principles and standards of the Marshall County Subdivision Control Ordinance in that the local roads are required to have access to minor collector roads, and since neither Olive Trail nor 12th Road are built to the design standards of a minor collector road, the roads are not adequate to serve this subdivision.

5. The proposed subdivision conflicts with the Land Use Plan section of the Marshall County Indiana Comprehensive Plan, pages 5–8 and 14–21. This development is located in an agricultural area, approximately one (1) mile from other similar development patterns. This subdivision's approval in this area would be in violation of the principles for residential development as set forth in the Marshall County Comprehensive [P]lan. It is a haphazard development that is not located in or around an existing city or town, it is a medium density non-farm development that occurs in an agricultural area that should have a rural density, and it places a demand on public services, such as fire and police protection, in an agricultural area. This development leaps over large, undeveloped, and unserved areas of agricultural land and establishes a large, urban development at a greater-than-rural housing density without provisions for infrastructure or community services.

*Appellant's Appendix* at 13–17.

Following a February 22, 2001 public hearing, the Commission voted 5–3 to deny Van Vactor's preliminary plat approval. Van Vactor subsequently sought relief by

filing a petition for writ of certiorari with the Marshall County trial court. The trial court upheld the Commission's decision. Van Vactor now appeals.

## DISCUSSION AND DECISION

■ Our standard of review is settled and well-articulated, despite the parties' dispute to the contrary. In reviewing an administrative agency decision, we are guided by IC 4–21.5–5–14 which prescribes the scope of court review of an administrative decision. *Equicor Dev. Inc. v. Westfield–Washington Township Plan Comm'n*, 758 N.E.2d 34, 37 (Ind.2001). The statutory standard provides that a court may provide relief only if the agency action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Id.* Further, "[t]he burden of demonstrating the invalidity of the agency action is on the party ... asserting invalidity." IC 4–21.5–5–14(a); *id.* "In reviewing an administrative decision, a court is not to try the facts de novo or substitute its own judgment for that of the agency." *Equicor*, 758 N.E.2d at 37 (citing IC 4–21.5–5–11). The *Equicor* court, citing *Town of Beverly Shores v. Bagnall*, 590 N.E.2d 1059, 1061 (Ind.1992), noted that "[t]his statutory standard mirrors the standard long followed by this Court." *Equicor*, 758 N.E.2d at 37.

 In *Bagnall*, our supreme court articulated the following standard of review: "When an aggrieved party seeks relief in a trial court from an adverse administrative determination and attacks the evidentiary support of the board's findings, he bears the burden of demonstrating that the board's conclusions are 'clearly erroneous.'" *Bagnall*, 590 N.E.2d at 1061 (citing *Stewart v. Fort Wayne Community Schs.*, 564 N.E.2d 274 (Ind.1990)). We will only reverse the Commission's decision if the evidence, viewed as a whole, demonstrates that the Commission's conclusions are clearly erroneous. *Id.* We give the Commission's decision great deference when the findings of fact or the application of the facts to the law are challenged. *Id.* However, if the party alleges that the Commission committed an error of law, such deference is not afforded and reversal is appropriate if an error of law is demonstrated. *Id.*

 Further, we presume that the Commission's decision was correct, and it will not be overturned unless it is arbitrary, capricious, or an abuse of discretion. *Plan Comm'n for Floyd County, Indiana v. Klein*, 765 N.E.2d 632, 642 (Ind.Ct.App. 2002) (citing *Wolff v. Mooresville Plan Comm'n*, 754 N.E.2d 589, 592 (Ind.Ct.App. 2001)). The Commission's decision will be sustained if it was correct on any grounds stated for disapproval of the petition. *Id.*

 The court in *Equicor* additionally expounded upon the appropriate standard of review given factual findings based on a paper record:

On appeal, to the extent the trial court's factual findings were based on a paper record, this Court conducts its own de novo review of the record. *Cf. Houser v. State*, 678 N.E.2d 95, 98 (Ind. 1997) ("Because both the appellate and trial courts are reviewing the paper record submitted to the magistrate, there is no reason for appellate courts to defer to the trial court's finding that a substantial basis existed for issuing the warrant."). If the trial court holds an evidentiary hearing, this Court defers to

the trial court to the extent its factual findings derive from the hearing. *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001).

*Equicor*, 758 N.E.2d at 37.

 Van Vactor first challenges the validity of the Marshall County Subdivision Control Ordinance ("the ordinance") provisions relied upon by the Commission to deny approval of its plat. For an ordinance to be valid, it must be " 'precise, definite, and certain in expression.' " *Wolff*, 754 N.E.2d at 593 (quoting *Burrell v. Lake County Plan Comm'n*, 624 N.E.2d 526, 529 (Ind.Ct.App.1993), *trans. denied* (1994)). An ordinance will not be construed so as to defeat its purpose " 'if it is sufficiently definite to be understood with reasonable certainty.' " *Id.* We will interpret ordinances so as to uphold their validity whenever possible. *Id.* The purpose of requiring standards to be written with sufficient precision is to provide fair warning to the subdivider as to the factors the Commission will consider in making its decision. *Id.* Further, when construing the words and phrases in a particular section, we construe them together with other words and phrases in that section, as well as with the ordinance as a whole. *Burrell*, 624 N.E.2d at 530. As discussed more fully below, Van Vactor concedes that portions of Article 5 set forth concrete and specific standards upon which the Commission is to be guided in its review of a subdivision plat. Accordingly, construing the ordinance as a whole, we conclude that the ordinance itself is valid.

 Van Vactor further alleges that the Commission's findings of fact and conclusions do not refer to any of the specific and concrete standards contained in the ordinance. Specifically, Van Vactor claims that rather than relying upon the specific standards contained in §§ 502–508 of the ordinance, the Commission relied upon the general standards contained in §§ 501.3, 501.4, and 501.5(d). Van Vactor also maintains that the Commission relied upon standards extrinsic to the ordinance by ignoring provisions of the ordinance and imposing standards that are not contained in the ordinance.

Article 5 of the ordinance sets forth specific, concrete requirements in the sections (i.e., §§ 502–508) following the general factors or principles listed in § 501. These sections are to be considered by the subdivider in designing a proposed subdivision and by the Commission in approving such proposal. In relevant part, § 501 of Article 5 of the ordinance, which is entitled "DESIGN PRINCIPLES AND STANDARDS" provides:

501 *GENERAL.*

501.1 In determining whether an application for approval shall be granted, the Commission shall determine if the plat conforms to the principles and standards required in this Article, which shall be deemed as minimal; and whenever the applicable requirements of other County ordinances are higher or more restrictive, those requirements shall control any application for plat approval.

501.2 In the subdividing of any land, due regard shall be shown for all natural features, such as tree growth, watercourse, historic spots, or similar conditions which, if preserved, will add attractiveness and value to the proposed development.

501.3 Due consideration shall be given to the prevention of air and stream pollution, proper treatment and disposal of refuse and other waste, and the elimination of other blighting characteristics.

501.4 The subdivision layout shall be of such a character that it protects the health, safety, and general welfare of the County and its residents.

501.5 In designing a street system, the subdivider shall be guided by the following principles:

\* \* \* \*

(d) Local circulation systems and land development patterns shall not conflict with the efficiency of bordering arterial routes.

*Appellant's Appendix* at 89.

In contrast, §§ 502–508 of the ordinance contain specific standards concerning, among other things, the roadways surrounding the subdivision and those within the subdivision, lot standards, easements, and soil conditions. Section 502 is entitled "Geometric Street Standards." Section 503 contains standards and requirements for the streets. Section 504 is entitled "Block Standards." Section 505 contains standards required for the subdivision lots. Section 506 concerns easement requirements. Section 507 contains requirements for commercial and industrial subdivisions. Section 508 contains standards for soil limitations and natural features.

 A plan commission's only task when reviewing an application for preliminary plat approval is to determine whether the proposed plat complies with the concrete standards set forth in the subdivision control ordinance, and the commission cannot deny an application on the basis of factors outside the ordinance. *Klein,* 765 N.E.2d at 646. Recently, in *Klein,* we described the subdivision application and review process:

Pursuant to Indiana Code section 36–7–4–701(b), the relevant legislative body in an area (typically the county commissioners) must adopt an ordinance, proposed by the local plan commission, to control the subdivision of land. Once the measure has been adopted, the local plan commission has exclusive control over the approval of all plats involving the land covered by the ordinance.

IND.CODE § 36–7–4–701(c). *The ordinance must contain specific standards by which the plan commission can determine whether the plat qualifies for approval.* IND.CODE § 36–7–4–702(b). These standards may address a variety of factors, but must address the minimum width, depth, and area of lots in the subdivision; the width, grade, and curves of streets in the subdivision and the coordination of those streets with other existing or planned streets; and the extension of water, sewer, and other municipal services. IND.CODE § 36–7–4–701(b).

.... *In considering an application for primary approval, the plan commission is limited to determining whether the specific requirements set out in the subdivision control ordinance have been met. Plan Comm'n of Harrison County v. Aulbach,* 748 N.E.2d 926, 936 (Ind.Ct. App.2001), [*trans. denied*] *If the requirements in the ordinance have been met, the plan commission must approve the plat. Id.* A plan commission's role in this regard is purely ministerial, and the commission has no discretion to deny an application that meets the requirements of the applicable subdivision control ordinance. *Id.* The plan commission's primary approval of an application must be accompanied by written findings. IND. CODE § 36–7–4–707(a).

Similarly, the commission's determination that primary approval should not be granted on the ground that the requirements set out in the subdivision control ordinance have not been met must be memorialized in a written decision containing findings explaining the commission's reasons for disapproval. IND.CODE § 36–7–4–707(b). The commission must provide these findings to the developer at the first opportunity, and *the findings must contain a com-*

*plete list of all the specific and concrete reasons the proposed plat fails to comport with the standards set out in the ordinance, so that the developer may amend its plat to comply with the ordinance.* Aulbach, 748 N.E.2d at 936. All of the asserted defects in a plat must be identified at one time, and a plan commission may not raise asserted defects in a piecemeal fashion. *Tippecanoe County Area Plan Comm'n v. Sheffield Developers,* 181 Ind.App. 586, 394 N.E.2d 176, 185 (1979).

*Id.* at 640–41 (emphasis added).

Here, we agree with Van Vactor that § 501 of Article 5 sets forth only general principles and standards and that the specific and concrete standards are contained in §§ 502–508 of Article 5. The general provisions contained in § 501 standing alone cannot support the Commission's denial of preliminary plat approval. Accordingly, to the extent that the Commission's findings of fact and conclusions concerned the on-site septic systems and the wastewater sludge, we agree that the Commission did not rely upon concrete and specific standards in denying plat approval. Specifically, Findings of Fact 18(A)-(D) and Conclusions 2, 3, and 5, which ostensibly justify the Commission's denial of plat approval, do not relate to any of the specific standards contained in the ordinance. Mere reliance upon public health, safety, and general welfare is too indefinite to provide Van Vactor with notice of the nature in which its plat does not comply with the requirements of the ordinance.

In *Brant v. Custom Design Constructors Corp.,* 677 N.E.2d 92 (Ind.Ct.App.1997), the structure of the subdivision control ordinance at issue was similar to that of the case before us. Article I, § 1.1 of the ordinance provided:

1. The purposes of these subdivision regulations are to protect and promote the public health, safety, and general welfare, and to provide for:

a. Guidance of future growth and development in accordance with the comprehensive planning process.

b. Protection of the character and the social and economic stability of all parts of the area, and to encourage the orderly and beneficial development of all parts.

c. Protection and conservation of the value of land, buildings, and other improvements upon the land, and to minimize the conflicts among the uses of land and buildings.

d. Avoidance of scattered and uncontrolled subdivision of land that would result in the unnecessary imposition of an excessive expenditure of public funds for the supply of services that are a part of community infrastructure.

e. Establishment of reasonable standards and procedures for subdivisions and resubdivisions, in order to further the orderly layout and use of land; and to insure proper legal descriptions and monumenting of subdivided land.

f. Prevention of the pollution of air and water; provision of drainage facilities and the safeguarding of the water table; and the encouragement of wise use and management of natural resources in order to preserve the integrity, stability, natural beauty and topography, and the value of land.

*Id.* at 97–98.

The court noted that Article I, and specifically § 1.1, concerned merely the purposes and objectives of the ordinance and noted, "[i]n substance, the section merely references the planning objectives that the legislative body used to craft the rules and standards for subdivision control which follow in the ordinance." Citing *Sheffield Developers,* 181 Ind.App. at 601, 394 N.E.2d at 186–87, the court while noting

that "the article as a whole suggests that the standards and requirements by which a plat's compliance would be judged are contained in the rest of the ordinance," concluded that the language was general and contained no specific standards upon which a proposed plat could be judged. *Brant,* 677 N.E.2d at 98. Likewise, the section failed to provide the requisite fair warning as to what would be required for a parcel of land to be subdivided.

Similarly here, the "preamble-like" language used in § 501 is general with no specific standards upon which the Commission could determine the fate of the proposed subdivision. Further, the language of § 501 also suggests that specific standards and requirements concerning the design and layout of the subdivision, including street, sewage, and drainage systems, are contained in the remainder of Article 5.

Moreover, we note that Article 6 of the ordinance, entitled "IMPROVEMENTS AND INSTALLATIONS," contains § 603, which deals specifically with drainage systems, and § 604, which concerns sewage disposal. These sections provide specific requirements, standards, and specifications for water drainage and sanitary sewer disposal for the proposed subdivision. Yet, the Commission did not find that the proposed septic system or the use of wastewa-

ter sludge violated either of these specific provisions. Instead, it couched its decision within the general provisions of § 501. Article 6 contains concrete and specific standards and should have been considered by the Commission. *See Brant,* 677 N.E.2d at 98. For the foregoing reasons, the Commission erred in utilizing the provisions of § 501 as its sole grounds for disapproval of the plat on the basis of the septic system and wastewater sludge.

However, we find that Finding of Fact 18(A) in conjunction with Finding of Fact 18(E) and Conclusions 1 and 4, which concern the roadways and traffic, are based upon concrete and specific provisions of the ordinance requiring certain design specifications for the bordering roads. Unlike the Commission's sole reliance upon the general language of § 501 with respect to the septic system and wastewater sludge, when construed together, the Commission's findings and conclusions concerning the roadways and traffic relate to specific provisions of the ordinance in a way as to provide fair notice to Van Vactor. In reaching its decision on the issue of traffic, the Commission used the specific provisions of §§ 222.4–222.7, 502.1, and 602.1(a) and (b)[1] to illuminate the general provisions of §§ 501.4 and 501.5(d).

Here, the health, safety, and general welfare language does not stand alone as

---

**1.** Section 222 specifically concerns the classification of various types of streets. The relevant provisions are as follows:

222.4 *Minor Collector Roads* are moderate capacity thoroughfares designed to accommodate relatively low speed traffic. Two moving lanes, unseparated, but wider than Local Road lanes are required.

222.5 *Local Roads* are low capacity and low speed roads whose function is to provide direct access to homes and property. Through-traffic and heavy use of these roads should be discouraged. *To the extent possible, residence driveways and ingress and egress points to other uses or structures should be oriented to the Local Roads rather*

*than to the Arterials of (sic) Collectors.* (emphasis added)

222.6 *Marginal Access Streets* are Local Roads which are parallel to and adjacent to arterial streets and highways, and which provide access to abutting properties and protection from through-traffic.

222.7 *Cul–De–Sac–Street* is a Local Road with only one outlet, having a paved circular turn-around area at the closed end.

Section 502.1 states that "[a]ll dedicated rights-of-way shall conform to the following minimum dimensions:

Arterial Streets . . . . . . . . . . . . . . . . . . . . . 130 feet
Major Collector Streets . . . . . . . . . . . . . . 100 feet
Minor Collector Streets . . . . . . . . . . . . . . 70 feet

the Commission did not rely exclusively upon the provisions of § 501 to deny the preliminary plat approval. The Commission denied the subdivision plat on the basis that Olive Trail and 12th Road were inadequate and dangerous given the increased amount of traffic from the subdivision on rural roads, used partly for agricultural purposes, and that were not properly designed for additional traffic. Further, the Commission had legitimate traffic safety and congestion concerns given the current design specifications of the roadways.

Despite Van Vactor's argument to the contrary, the Commission heard evidence in addition to that presented from the remonstrators that the rural roadways were inadequate to handle the increased traffic. Accident reports for 1999 and 2000 were submitted, as well as evidence of the amount of traffic utilizing Olive Trail as a detour when a state road was closed for repair. Additionally, the parcel of property, although approved for the building of single-family dwellings, was situated in an agriculturally zoned district rather than a completely residentially zoned district. We finally note that a review of the record before us on appeal does not disclose that the Commission based its decision on standards extrinsic to the ordinance. Indeed, given our above discussion, the Commission based its decision upon standards contained within the ordinance itself. Accordingly, we conclude that the Commission appropriately denied the preliminary subdivision plat on the basis of the rural character of the roadways and increased traffic.

 Van Vactor next contends that the Commission's findings and conclusions are not supported by sufficient evidence.

However, the Commission held four hearings between June 2000 and February 2001 concerning the preliminary plat approval for the Prairie Meadows subdivision. The Commission heard and collected evidence from the proponents and dozens of remonstrators. Indeed, the record before us includes an eight-volume appendix containing over 1,200 pages. Additionally, the record includes the transcript of the hearing conducted by the trial court in its review of the Commission's decision. We conclude that Van Vactor's argument simply invites us to reweigh the evidence presented to the Commission. In an administrative proceeding that involves technical or scientific evidence, we will not determine the credibility or weight to be given to technical evidence, such as that heard by the Commission. *Wolff,* 754 N.E.2d at 594 (citing *Burrell,* 624 N.E.2d at 534–35). Instead, our function is to determine if the evidence before the Commission taken as a whole provides a reasonable evidentiary basis for its decision. *Id.* Here, we conclude that the Commission was presented with competent and sufficient evidence from which it could base its decision.

 Van Vactor finally contends that the Commission's decision was illegal, arbitrary, and capricious. To support this argument, Van Vactor cites to the comments of several members of the Commission that their basic problem with the proposed subdivision was that it did not comply with provisions of the zoning ordinance. Further, Van Vactor points to the fact that the Commission decided to deny the application and then commented that it would "sift the sand" in an attempt to justify its decision. *Appellant's Brief* at 44.

 " '[A]n administrative act is arbitrary and capricious only where it is willful

| | |
|---|---|
| Cul–de–Sacs | 60 feet* |
| Crosswalks | 10 feet |
| Utility Easements | 15 feet |

\* radius"

Section 602.1(a) and (b) provide specific requirements and dimensions for street improvements, including the width of the streets.

**1148**

and unreasonable, without consideration and in disregard of the facts and circumstances in the case, or without some basis which would lead a reasonable and honest person to the same conclusion.'" *Equicor*, 758 N.E.2d at 37 (quoting *Dep't of Natural Res. v. Indiana Coal Council, Inc.,* 542 N.E.2d 1000, 1007 (Ind.1989)).

Although we conclude that Van Vactor has not established that the Commission's comments satisfied this heightened burden, we chastise the Commission for its comment about "sifting the sand." We remind the Commission that approval of a plat that meets the requirements of the applicable ordinance constitutes a ministerial as opposed to a discretionary act. *Brant,* 677 N.E.2d at 96. Thus, if the proposal meets the concrete standards of the ordinance, then "'the approval or disapproval of the plat on the basis of the controlling standards is a ministerial act.'" *Id.* (citing *Knutson v. State ex rel. Seberger,* 239 Ind. 656, 659, 157 N.E.2d 469, 471 (1959), *reh'g denied,* 239 Ind. 656, 160 N.E.2d 200). We strongly admonish the Commission to remember its role in such cases. In the future, the Commission should avoid such comments and more accurately characterize the portions of the ordinance upon which it relies in its review of subdivision proposals. Failure to remember its ministerial role opens the Commission's decision to criticism and creates the appearance of impropriety. Having said this, however, we conclude that the Commission did not act arbitrarily or capriciously in denying the proposed subdivision plat.

Affirmed.

MAY, J., and MATHIAS, J., concur.